STATE, Respondent, v. RATHBONE, Appellant.

(No. 8,011.)

(Submitted January 22, 1940.   Decided March 5, 1940.)

[100 Pac. (2d) 86.]

Messrs. *Toomey, McFarland & Chapman* and *Mr. Wilbur H. Wood,* for Appellant, submitted a brief; *Mr. E. G. Toomey* and *Mr. John W. Chapman* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Mark H. Derr,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Derr* argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher*, representing the Montana Stockgrowers Association and the Montana Wool Growers Association, and appearing as *amici curiae*, submitted a brief; *Mr. Rankin* argued the cause orally.

*Mr. John G. Brown* and *Mr. W. B. Leavitt* appeared as *amici curiae*; *Mr. Leavitt* submitted a brief and both argued the cause orally.

*Mr. Clarence E. Wohl*, *Mr. Earl N. Genzberger* and *Mr. Joe C. Giacoma*, representing a number of Sportmen's Associations and appearing as *amici curiae*, submitted a brief; *Mr. Genzberger* argued the cause orally.

HONORABLE RUDOLPH NELSTEAD, District Judge, sitting in place of MR. JUSTICE MORRIS, disqualified, delivered the opinion of the court.

On March 3, 1939, a day during the closed season for killing elk, defendant C. R. Rathbone killed a wild elk on the ranch of which he was the owner and operator known as the Circle H near Augusta in Lewis and Clark county. Immediately after the killing, defendant sent a telegram to the state game warden at the office of the Fish and Game Commission at Helena which read: ''We are killing elk on our ranch stop advise quickly disposition of carcasses.'' The following day a deputy game warden went out to investigate. Defendant informed him that he had killed an elk the preceding afternoon and where he might find the carcass. Following defendant's directions, the deputy game warden found the elk approximately where defendant stated it would be. Arrested for the crime of killing an elk out of season, defendant was tried and convicted in the justice's court of Helena township. Thereupon he appealed to the district court and was convicted by a jury in a trial *de novo*. In his appeal to this court defendant in his brief enumerates fifty-nine specifications of error, all of which relate to the one vital point in the case, *id est*, defendant's right to justify his action by proof that the killing of the elk was necessary in defense of his property. The state in the trial in the district court having proved that the defendant shot the elk in question out of season, rested its case. Thereupon defendant took the witness stand and, after identifying maps showing the location of his ranch in Lewis and Clark county, was asked the following question by his counsel: ''At the time you shot the elk in question, what was the elk doing?'' The county attorney objected to this question as incompetent, irrelevant and immaterial, and stated to the trial court that ''it is our contention that justification is not or has no basis in a case of this sort. We make the further objection that the defendant has a remedy under section 3729.1, which provides that the Fish and Game Commission may destroy and kill elk which are damaging prop-

erty. He has not availed himself of this remedy and therefore justification is not a proper defense to the killing of elk.'' Upon inquiry by the trial court as to whether or not the question was designed to elicit justification and an answer in the affirmative by defendant's counsel, the objection was sustained. The trial court excused the jury, whereupon counsel for defendant made oral and written offers of proof in support of his defense of justification.

The offered evidence may be summarized as follows: For many years there has been a large and increasing herd of wild elk, having its summer and fall range within the Lewis and Clark National Forest to the southwest, west, and northwest of the defendant's ranch. During the summer and fall months these animals range and forage within the forest regions, staying well back in the hills and away from the private lands of the defendant and his neighbors. As winter weather sets in annual migrations of the elk begin, leading them to follow various natural courses through the forest reserve, down creek bottoms, and along ridges, many of which natural trails converge and enter upon the Circle H ranch. This annual migration of the elk has been observed yearly, commencing with 1925, and is induced by the severe weather and scarcity of natural feed for the animals at that period of the year. Because of certain precipitous ridges in the mountain wall along the eastern boundary of the National Forest, and because of the fact that several streams flow out of the forest onto the lands of the defendant, it is inevitable that the migrating elk follow these watercourses and consequently gather upon the ranch lands of the defendant where they remain to graze until molested, and, when driven away, very often return to these grazing lands, making them their feeding grounds as long as they are able to do so.

The evidence offered also tended to prove that for many years past, going back as far as 1931 in the case of the defendant, these migrating elk have each year done serious and substantial damage to the defendant's ranch, amounting to at least $2,250 per year. The principal items of damage are consumption of pasture and other forage reserved for livestock, injury to the turf

curtailing the productiveness of hay and other natural grasses growing on the ranch lands, serious and costly destruction of fences caused by the attempts of the elk to jump over the fences and either becoming entangled in the wires or breaking through them. Also, serious damage has resulted annually in that the presence of the elk interferes materially with normal ranching operations since they constantly threaten to destroy necessary reserves of winter and spring feed for domestic animals, their presence makes it necessary to interfere with the normal work of the ranch in order to drive them away, damage to the fences requires interruption of ranching operations and, finally, the disturbance caused by the elk themselves and driving them off the ranch excites domestic livestock which are injuriously affected thereby.

From the offered evidence it appears that elk cannot be kept off the defendant's ranch by fencing it for the reason that elk can jump any legal fence, although they often become entangled and tear such fences down in attempting to do so. An elk-proof fence could be built by defendant only at a prohibitive expense. Any effort to keep elk off the property by driving them away is as a rule ineffective because they naturally feed at night at a time when no patrol can successfully operate, because the ranch area is so large, consisting of 4,000 acres, that it would require a large number of men working steadily to adequately protect the property and keep the elk away, and because the size of the herd, which is estimated upon the basis of reliable counts to consist of 2,200 to 3,000 animals, contributes to the impossibility of keeping them off by using patrols at defendant's expense. The cost of such patrolling in so far as defendant is concerned would be prohibitive. The patrol maintained by the Fish and Game Commission did not exceed two men at any one time excepting the winters of 1933–1934 and 1938–1939, preceding each of which winters defendant declared he would be forced to kill elk to protect his property from material damage. It further appears from the offers of proof that the invasion of elk on defendant's ranch has been continuous since he acquired the property in 1931, and that he had

counted as many as 350 elk at one time feeding and grazing on his ranch; that elk continued to graze and feed in many instances for periods of not less than eight or more hours, sometimes in bands from the herd, although there were always stragglers. Also, defendant offered to testify that in his normal work from day to day he actually saw and counted elk on the Circle H ranch immediately preceding the killing of the elk in question, as follows: February 7, 1939, twenty elk in the spring pasture and twelve elk in a pasture north of Willow Creek; on February 8, fifteen elk in the spring pasture and another band about an hour later coming from the forest onto his ranch; on February 9, ten bull elk and in addition about ten deer in the spring pasture near the horse pasture division fence; on February 10, seven bull elk and a few deer in the spring pasture, and on the same day twenty-five elk in the spring pasture near the front gate and cattle shed, and still later on the same day five elk in one of his meadows. In the spring pasture on February 11, he saw ten elk; on February 13, five or six elk; on February 16, twenty elk, and on February 17, ten elk. On February 20 there were five elk in one of his meadows, and on February 27 eight elk in the spring pasture. On February 28, while working in the course of his ranch operations he saw fifteen elk in another field on the ranch which became frightened, jumped over the fence breaking it down and escaping into the forest. On March 1 seven or eight elk were again seen by him in the spring pasture, and on March 3, 1939, he saw two bull elk in the home meadow, one of which he shot and killed. All of the elk, including the one killed by defendant, were a part of the herd which had continuously during the time defendant owned the Circle H ranch had their feeding grounds in the Lewis and Clark National Forest adjoining defendant's lands, or on the ranch itself.

With respect to the elk killed by defendant as charged in the complaint, evidence was offered to prove that at the time of the killing the elk was destroying the turf in one of the home pastures of the defendant's ranch, that it was actually consuming feed which was needed for the domestic animals owned

by the Circle H ranch, and that it was headed toward a particular pasture in which the feed had been reserved for spring feeding of defendant's cows at the time when they would be having their calves and would require intensive feeding under close observation, which pasture was situated adjacent to the home buildings of the ranch and was particularly valuable for that reason.

Finally, the offered evidence tends to show that annually subsequent to the year 1933, defendant attempted to obtain relief from the invasions of elk by peaceful means and without the resort to force. Numerous communications from the defendant to various officials of the United States Government having jurisdiction over the Lewis and Clark National Forest were offered in evidence, which were made by him in an effort to obtain the help of the federal authorities, either in reducing the size of the elk herd, or in increasing the amount of natural feed within the forest or adjacent thereto available for the elk so that they would not find it necessary to trespass upon his land. Correspondence had between the defendant and the Fish and Game Commission, which will hereafter be considered, was offered in evidence, showing repeated written protests and complaints by defendant calling the attention of the commission to the fact that elk were trespassing upon and damaging his property, and requesting relief from the commission. The offered evidence shows that the Fish and Game Commission took no action regarding the protest and complaints, excepting that commencing in the year 1933 the commission established a patrol, as hereinbefore stated, in the vicinity of defendant's ranch or actually upon it, which patrol endeavored to keep the elk off, but without any material success.

Objections to defendant's offers of proof having been sustained, defendant offered six instructions all bearing upon the question of his right to kill elk in defense of his property. Objection was interposed on the ground that "justification in defense of property is not proper as a defense to the crime charged and that pursuant to and under section 3729.1, Revised Codes of Montana, the defendant should have availed himself

of the remedy therein offered, and, having failed to do so, the defense of justification is improper.'' This objection was sustained by the trial court.

Defendant's entire defense as urged on this appeal is predicated upon the proposition that the Constitution of Montana guarantees to every person the right to enjoy and defend his property, including the right to kill a game animal out of season if it is reasonably necessary to do so. Article III of the Constitution is ''A Declaration Of Rights Of The People Of The State Of Montana.'' Section 3 thereof reads as follows: ''All persons are born equally free, and have certain natural, essential, and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness in all lawful ways.'' Section 13 of this Article, in so far as pertinent to this case, reads: ''The right of any person to keep or bear arms in defense of his own home, person, and property * * * shall not be called in question * * * .''

These constitutional provisions enunciate natural, fundamental and inalienable rights enjoyed by and guaranteed to every person residing within the state of Montana. They are absolute and self-executing in so far as they limit the power of the legislature to restrict these rights of the people for the reason that section 29 of the same Article provides: ''The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.'' In *Herlihy* v. *Donohue,* 52 Mont. 601, 607, 161 Pac. 164, 165, Ann. Cas. 1917C, 29, L. R. A. 1917B, 702, this court said: ''The right of a person to acquire, hold, and protect property * * * is, as among English-speaking people, as old as the common law itself. Its origin antedates by many years the guaranty contained in *Magna Charta.* The right itself was the inheritance of our people who inhabited the territory acquired from Great Britain at the close of the Revolution, and was adopted by the people of the territory of Montana by its first legislative assembly, and was continued in force thereafter. It is now em-

bodied in the Bill of Rights (Article III of our state Constitution)."

If the plea of justification for the killing of an elk or other destructive wild animal cannot be relied upon by a defendant in an action charging him with such killing, the constitutional provisions referred to become a nullity. Although the killing of a human being is a felony for the commission of which in certain cases the state may impose on a defendant the extreme penalty of death, nevertheless in justification of such killing he may offer evidence that the homicide was committed in defense of his property. (Sec. 10965, Rev. Codes.) The same is true as to cases of criminal assault. A defendant has a right to interpose the defense of property in justification of his act. (Subd. 3, sec. 10980, Rev. Codes.) If one may kill a human being or attack him in defense of his property, it would be an unreasonable doctrine to hold that the right of defense of property as justification for the killing of wild beasts of the field and the forest does not exist. The State Fish and Game Commission was created to protect the wild life of the state. (Sec. 3653, Rev. Codes.) It is unlawful to shoot or kill an elk during the closed season in that portion of Lewis and Clark county where defendant's ranch is situated. (Sec. 3696, Rev. Codes.) The only exception is section 3758, Revised Codes, to the effect that: "When it is shown that any violation of the provisions of this Act was for the purpose of preventing great suffering by hunger of any person or persons, which could not otherwise have been avoided, the provisions of this Act shall not apply to said case." There is no provision in the Fish and Game Code extending to a person the right to kill an elk in defense of his person or his property. By the terms of the Code, one killing an elk under such circumstances has no redress for past damages for the reason that wild game including elk belong to the State in its sovereign capacity. (*Rosenfeld* v. *Jakways,* 67 Mont. 558, 216 Pac. 776.) And the State, without its consent, cannot be sued by an individual for damages. (*Mills* v. *Stewart,* 76 Mont. 429, 436, 247 Pac. 332, 47 A. L. R. 424;

*State ex rel. Robert Mitchell Co.* v. *Toole,* 26 Mont. 22, 28, 66 Pac. 496, 91 Am. St. Rep. 386, 55 L. R. A. 644.)

If section 3696, Revised Codes, is to be so construed as to prevent the killing of an elk out of season when reasonably necessary in defense of property, it is unconstitutional and inoperative because it denies to a person the right guaranteed to him to protect his property by force if necessary. The laws relating to the protection of fish and game are special enactments pursuant to the police power of the State. If any provision of a special enactment is found to be inoperative, resort may be had to the general law in order to harmonize the statutes and if possible make the later statute dealing with the particular subject operative. (*State ex rel. Ewald* v. *Certain Intoxicating Liquors,* 71 Mont. 79, 227 Pac. 472.) The general law concerning the right to use force is section 5694, Revised Codes, which must be construed *in pari materia* with section 3696, supra, and reads as follows: "Any necessary force may be used to protect from wrongful injury the person or property of one's self, or of a wife, husband, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest." The State may as a matter of public policy prohibit absolutely the killing of game animals, or it may regulate the killing, and, if it grants the right at all, it may do so upon such terms and conditions as it sees fit to impose "so long as constitutional limitations or guaranties are not infringed." (*Rosenfeld* v. *Jakways,* supra.) The people of the State may protect their public property in the manner best suited to accomplish the purposes for which the law was enacted, but in so doing they may not disregard the natural and inalienable rights of individuals. Legal justification may always be interposed as a defense by a person charged with killing a wild animal contrary to law. We quote from *State* v. *Burk,* 114 Wash. 370, 195 Pac. 16, 17, 21 A. L. R. 193, in which the issues were practically identical with those in the case now under consideration: "The argument of the state is to the effect that one may not justify himself in the killing of an elk, in violation of express provisions of the

statute, simply because the elk, at the time of the killing, may be damaging, or even threatening to destroy, the property of the person charged with the killing. It is argued that when the legislature enacted this statute for the protection of elk it must have realized that they might trespass upon the lands of private individuals and do material damage to crops or domestic animals, but determined that the preservation of the elk was of such importance to the people of the state as that the private individual should bear his loss for the good of the public. This argument is more plausible than sound. * * * If in this case the appellant had undertaken to defend on the ground that he killed the elk for the protection of his life, or that of some member of his family, then, unquestionably, such defense would have been available. But the constitutional right is to defend, not only one's life, but one's property. The difference in the justification in killing a protected elk in defense of one's life and killing one in defense of one's property is only in degree.''

To the same effect is the decision of the court in *State* v. *Ward,* 170 Iowa, 185, 152 N. W. 501, 502, Ann. Cas. 1917B, 978. A statute of Iowa made it unlawful for any person to kill any elk or deer. There was a large band of deer in the immediate vicinity of defendant's farm. This band for a long time past trespassed upon defendant's premises, eating up and trampling down much of his grain. From time to time he had driven them away, but on one occasion he shot and killed a member of the band. Having been arrested for killing the deer, he was convicted in the lower court and appealed to the supreme court of the state. The judgment of conviction was reversed and the court, in the course of its opinion, says: ''The one question in the case is whether a person who kills a deer, elk, or goat is necessarily guilty of violating the statute regardless of the reasons for such killing. To put it in another way: Is it open to the defendant to justify an admitted killing by showing a reasonable necessity in defense of person or property? * * * The right of defense of person and property is a constitutional right * * * , and is recognized in the construction of all statutes. If in this case it was reasonably necessary for the

defendant to kill the deer in question in order to prevent substantial injury to his property, such fact, we have no doubt, would afford justification for the killing." (See, also, the following: *People* v. *Zerillo*, 219 Mich. 635, 189 N. W. 927, 24 A. L. R. 1115; *Aldrich* v. *Wright*, 53 N. H. 398, 16 Am. Rep. 339; *State* v. *Urban*, 60 S. D. 614, 245 N. W. 474; *Cook* v. *State*, 192 Wash. 602, 74 Pac. (2d) 199.)

It is conceded that the construction to be given a right guaranteed to the individual by the Constitution must always be a reasonable one. The result of the operation of the police power is necessarily in most instances an infringement of private rights, but in the exercise of such power, property and individual rights may be injured or impaired only to the extent reasonably necessary to preserve the public welfare. It is difficult to enunciate a general rule with reference to the right of an individual to kill wild animals in defense of property because, as admitted by the Attorney General in his comment upon several of the cases cited by defendant in support of his argument on this appeal, wild animals have different characteristics, and elk, as distinguished from vicious, sly, ferocious and secretive animals, must be placed in a different classification. Neither are the several provisions of the Fish and Game Code uniform as to the procedure for the protection of property of an individual from destruction by wild game. It has previously been observed that as to elk an individual has no protection at all in the Fish and Game Code excepting, that pursuant to section 3729.1, supra, when private property is being actually or materially damaged or destroyed by elk, a written complaint of such damage may be filed by the owner with the state Fish and Game Commission and, in such event, the commission shall have the power and authority *whenever in its opinion conditions warrant it*, to take, kill, remove, or dispose of such elk.

Having come to the conclusion that justification is always a defense, the question arises as to whether or not the facts offered in support of this plea in the instant case are sufficient as a matter of law for submission to the jury. In *State* v. *Burk*, supra, the court says: "It might, with some reason,

be argued that under no circumstances is the question of the sufficiency of the testimony to show justification a matter of law for the court to decide. In any event, generally speaking, it is a question of fact for the jury.'' The procedure pursued by the district court in this case is proper, in the event the court has any doubt that the testimony which a defendant offers to prove in support of a plea of justification is sufficient in law. Justification cannot be based upon a mere trespass by wild animals. Montana is one of the few areas in the nation where wild game abounds. It is regarded as one of the greatest of the state's natural resources, as well as the chief attraction for visitors. Wild game existed here long before the coming of man. One who acquires property in Montana does so with notice and knowledge of the presence of wild game and presumably is cognizant of its natural habits. Wild game does not possess the power to distinguish between *fructus naturales* and *fructus industriales,* and cannot like domestic animals be controlled through an owner. Accordingly a property owner in this state must recognize the fact that there may be some injury to property or inconvenience from wild game for which there is no recourse. We need not here attempt to state what facts must exist before a property owner is justified in killing wild animals in order to protect his property. Each case must be decided upon its particular facts. Here the proffered evidence was to the effect that the elk had seriously and repeatedly damaged defendant's ranch property. With repeated trespasses in the future such damage, unless checked, would amount to virtual confiscation of the property. Certainly such a showing was sufficient to make the question one for the jury, subject to the rule that before the defendant can resort to force in protecting his property from wild animals, (1) he must have exhausted all other remedies provided by law; (2) the use of such force must be reasonably necessary and suitable to protect his property; and (3) he must use only such force and means as a reasonably prudent man would use under like circumstances.

Did defendant exhaust the remedy provided by section 3729.1, supra, before killing the elk in question? The section reads: "That whenever elk, imported within the state of Montana, or any portion thereof, have increased in numbers to such an extent that *in the judgment of the state fish and game commission* their number should be reduced, and special or private property is being actually or materially damaged or destroyed by said elk, and a written complaint of such damage has been filed by the owners or lessees of said property with the state fish and game commission, the said commission shall have the power and authority *whenever, in its opinion, conditions warrant it,* to take, kill, remove or dispose of such elk, or to permit the same to be taken, killed, removed, or disposed of under such rules, regulations and conditions as it may prescribe and promulgate." (Italics ours.)

Defendant offered to prove that he had made written complaint to the commission; that he had personally appeared before it and had corresponded with it and its officers over a long period of time. If the facts stated in the offers of proof relating thereto are true, and for the purpose of this appeal they must be accepted as true, then in our opinion defendant made a showing sufficient to go to the jury on the question whether he had exhausted every reasonably available remedy given him under this law for the protection of his property by peaceful means.

No question appears in the record as to the admissibility of the correspondence in evidence in so far as foundation for its introduction was concerned, and the only question left for the trial court to decide was whether, as a matter of substantive law, it was relevant and material to the issue of justification. On December 27, 1933, defendant sent a telegram to the state game warden at Helena advising that elk were invading his pastures and doing damage by consuming winter feed reserved for cattle, and a demand was made that something be done by the commission. This telegram was acknowledged by a letter informing defendant that one Nixon had been employed by the commission to drive the elk back to the hills and keep them

from the private lands of defendant and his neighbors. On February 23, 1934, the state game warden acknowledged receipt of a telegram from Rathbone making complaint of fresh elk invasions and damage. The letter informs defendant that additional patrolmen had been put on the job to keep the elk away from the ranch, the writer saying in part: ''I know of nothing that can be done other than what we are doing, and if you have any suggestions to make whereby we can accomplish more than has been done I would be pleased to receive them.'' In connection with this communication it is to be noted that section 3729.1, supra, had become law as section 1, Chapter 72, Laws of 1933, on March 7, 1933, nearly a year prior to the date of this letter from the warden; nevertheless no offer or suggestion is made by the commission that elk be killed in order to reduce the numbers so that further trespass would be obviated. Later, on March 3, 1936, the Fish and Game Commission wrote to Rathbone acknowledging receipt of a telegram making further complaint of elk damage. This letter merely states that the deputy game warden had the elk situation in hand. On March 9 Rathbone, in answer to the letter, points out that the protection afforded by the one-man patrol is inadequate and dangerous, and the suggestion is made that the commission put on help in addition to the single patrolman then on duty. At that time there were from 150 to 200 elk in Rathbone's pastures. This letter was acknowledged by the game warden on March 18 of that year, in the last paragraph of which answer there appears the following: ''We would like very much to make a reduction in that herd with the elk to be taken during the proper season and in the proper manner and any suggestions you may have which would work toward this end would be welcomed by the department.'' This communication by the game warden is important for the reason that the officers in charge of the enforcement of the game laws recognized the necessity of reducing the herd of elk three years before the defendant finally shot the elk for which act he was arrested and, although the commission had authority to take steps to reduce

the herd under section 3729.1, supra, nothing was done excepting to ask defendant whether he had any suggestions to make.

Two years later, March 30, 1938, the defendant again wrote to the Fish and Game Commission, reviewing the past history of the situation and the nature of the damage done by the elk to defendant's property, and made the following complaint: "Our ranch operations are being seriously interfered with and we are incurring a loss we should not be expected to sustain and we must ask that you take prompt action to eliminate for all time the damage the elk are doing to our property and to our ranching business. * * * I feel that the time has arrived when I must insist that some action be taken by you which will insure protection to our property from further depredation from the elk for all time to come." Again, on April 9, 1938, defendant wrote to the commission complaining of the fact that it had given defendant no definite information concerning its intention in regard to the elk situation as outlined in the previous letter of March 30. On April 12, 1938, the chief deputy warden replied to the latter communication in which he referred to a personal meeting between members of the commission and defendant, stating therein that defendant at such meeting made no positive suggestion of a remedy, but the writer advised that at the next meeting of the commission he and the game warden would make a recommendation to the commission that an elk-tight fence be placed around the Rathbone premises before elk should start drifting the following fall. Later, Rathbone was informed that a meeting of the commission would be held on May 9, 1938. He appeared at this meeting in Helena and read a long typewritten complaint, reviewing the whole history of the elk situation on account of elk trespass and damage as it affected the Circle H ranch. On May 20, 1938, defendant again wrote the commission, referring to a severe late storm and complaining of the fact that elk had again invaded his ranch in large numbers. A further demand was made to ascertain what the commission intended to do about the situation. On May 27, 1938, in his reply to this letter the fish and game warden calls attention to a resolution adopted by the commission, en-

larging by fifteen days the open season for hunting elk in the locality of the Circle H ranch. This letter contains the following: "The elk season has been opened earlier and has been lengthened in an endeavor to take sufficient elk to remedy the situation, but if by the time this season is over the kill has not been sufficient to keep the elk off your property, we will then send wardens in there and try to reduce that herd to the point where they will not bother your ranch."

The offers of proof disclose that elk continued to trespass in fairly large numbers from time to time during the winter of 1938–1939. On February 10, 1939, defendant sent a telegram to the game warden calling attention to the fact that elk were then trespassing in substantial numbers on the ranch, and requesting the commission for suggestions, particularly as to its plan to reduce the size of the elk herd. On February 27, 1939, four days before he killed the elk, defendant again wrote the commission, repeating the history of his difficulties on account of the elk invasion of his property and the damage done by them, referring to the ineffectiveness of the patrol and the fact that defendant had refrained from killing elk while waiting to ascertain whether the legislature would take action so that the commission could cooperate with the federal government under the so-called Pittman-Robertson Act, which would enable the state to acquire additional grazing lands for winter forage for the elk. There is in the record no reply by the commission to either the wire of February 10, 1939, or the final letter of February 27, 1939, asking for a permit to kill trespassing elk.

It appears, therefore, that over a period of five and a half years defendant had attempted to secure relief from the commission by following the procedure suggested by section 3729.1, supra. Defendant's offered testimony discloses that there were then more elk in the region than could be supported by feed naturally growing therein; that the only satisfactory means of correcting the situation would be to reduce the size of the herd; and that throughout this entire period the game patrol established by the commission was inadequate to cope with the problem. No elk-proof fence was ever constructed, and the herd

of elk, instead of being decreased in number, was increased and constantly invading the property of defendant and his neighbors. The offers of proof also contain testimony to the effect that the Fish and Game Commission and sportsmen interested requested defendant to refrain from killing elk during the season of 1938 and 1939 in the hope that the state legislature would take action to procure federal funds for the commission in order to secure additional winter pastures for the elk. When this hope failed the commission took no other steps to protect the defendant's ranch.

The Attorney General argues that "possibly, if the facts ▮▮▮ warranted it and if some action was imperative, the defendant could have availed himself of the remedy of mandamus in moving the commission to exercise its discretion." But section 3729.1, supra, leaves it entirely "in the judgment of the ✻ ✻ ✻ fish and game commission" as to whether or not an elk herd should be reduced in number. If a complaint is made, as by defendant in this case, that private property is materially damaged or destroyed by elk, the commission, "whenever in its opinion conditions warrant it," may take, kill, remove or dispose of such elk. A writ of mandate may issue to a board to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station. (Sec. 9848, Rev. Codes.) Mandamus lies only to compel the performance of a clear legal duty. (*State ex rel. Breen* v. *Toole,* 32 Mont. 4, 79 Pac. 403; *State ex rel. Donlan* v. *Board of Commissioners,* 49 Mont. 517, 143 Pac. 984; *State ex rel. Boulware* v. *Porter,* 55 Mont. 471, 178 Pac. 832.) Mandamus will compel action, but not control discretion. (*State ex rel. Stuewe* v. *Hindson,* 44 Mont. 429, 120 Pac. 485; *State ex rel. Scollard* v. *Board of Examiners,* 52 Mont. 91, 156 Pac. 124.) A mere reading of the statute discloses that it is entirely within the discretion of the Fish and Game Commission to determine when conditions warrant the killing, removal or disposal of elk (sec. 3729.1, supra), and for that reason defendant could not successfully have resorted to mandamus.

248

A comparison is made in the argument on behalf of the state between wild elk and range cattle which trespass, and damage and destroy property. It is said that "while elk are classified as animals *ferae naturae*, yet in many respects they present characteristics similar to range cattle, and could in the eyes of the law be treated the same as range cattle. No one would contend that defendant under similar circumstances could shoot and kill range cattle for trespassing upon his premises and injuring his crop." We again call attention to the fact that wild animals are the property of the State, and the State cannot be sued without its consent; whereas the owner of property, damaged by trespassing cattle or other livestock, may sue for damages, and, if the trespasses are repeated, he may also apply for injunctive relief against the owner of the livestock. (*Rea Bros. Sheep Co.* v. *Rudi*, 46 Mont. 149, 127 Pac. 85.)

Reverting to defendant's offered testimony regarding justification, we conclude as above stated that it is amply sufficient as a matter of law to go to the jury. It is for the jury to determine as a question of fact its sufficiency, as well as its truth or falsity. Therefore, the trial court erred in sustaining the state's objections to defendant's offers of proof.

Any evidence is relevant and material on the question of justification which relates to the history of the entire elk herd, its size, its migratory habits and the reasons therefor, and the ineffectiveness of patrols and legal fences to control them. Defendant should be allowed to offer testimony showing past injury by the band of elk "not for the purpose of justifying the appellant in killing them because of such past damage, but for the purpose of showing their destructive capability, and what the appellant might have expected the elk would do at the time he killed them, judging by past experience; that is to say, in determining whether or not it was reasonably necessary for him to kill the elk, the appellant might take into consideration his knowledge of damage done to him by the elk on other recent occasions, as tending to indicate the damage they might do on this occasion, if not interfered with." (*State* v. *Burk*, supra.) Damage suffered by others in the country

adjacent to defendant's ranch, and similarly situated, is also material as corroboration of defendant's judgment that the elk killed was capable of doing material damage. By a parity of reasoning, this conclusion is based upon the same rule as in homicide cases wherein a defendant relies upon a plea of self-defense, and shows the previous dangerous character of the deceased by specific acts of violence. In such cases it is not necessary that a defendant have personal knowledge of specific violent acts of the deceased sought to be proved. He may know of them only by hearsay from other persons. (*State* v. *Felker,* 27 Mont. 451, 71 Pac. 668; *State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035; *State* v. *Jennings,* 96 Mont. 80, 28 Pac. (2d) 448, 121 A. L. R. 375.)

Viewing the offers of proof as a whole, we conclude that the proffered evidence was sufficient to go to the jury on the question whether defendant acted as a reasonably prudent man in defense of his property.

The judgment of the district court is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGST-MAN, ARNOLD and ERICKSON concur.