STATE OF MONTANA ex rel. WILLIAM SACKMAN AND
EDNA SACKMAN, Petitioners and Respondents, v. STATE
FISH AND GAME COMMISSION of the State of Mon-
tana et al., Defendants and Appellants.

No. 11355.
Decided March 18, 1968.
Rehearing Denied April 9, 1968.
438 P.2d 663.

Brinton B. Markle, appeared, Helena, Chadwick Smith, argued, Helena, for appellants.

Daniels & Taylor, Deer Lodge, Marvin K. Daniels, argued, Deer Lodge, for respondents.

MR. JUSTICE CASTLES, delivered the Opinion of the Court.

This is an appeal from a judgment ordering the issuance of a peremptory writ of mandate commanding the State Fish and Game Commission to permit one Sackman, a rancher, to kill or destroy elk to protect his property and for $2,000 damages and for attorney fees and costs. The State Fish and Game Commission and its individual members are appellants here, and will be referred to as the Commission.

Sackman operates a 400 acre cattle ranch near Ovando where he runs 50 or 60 cows plus some bulls and heifers. He raises about 100 tons of hay in a "meadow" of about 100 acres, and the balance of the land is timber and pasture. The hay is kept in a shed and is used for winter feed. The ranch is nestled in the Blackfoot Valley right next to Markham Mountain, a winter range for a small herd of elk. Sackman knew the area and knew of the elk when he bought. Sackman bought the ranch in 1959 and has operated it since. Apparently no trouble was had in the first five years of his operation, but in the Spring of 1964 trouble began according to Sackman. He complained to a game warden that elk were consuming his pasture. In the Spring of 1965, Sackman killed an elk; or as he put it:

"* * * I killed one, and then I called them [Fish and Game officials] up, and, I was probably a little hasty about it, and I says, 'If you don't want them alive,' I says, 'You can get them dead, because I am going to start killing them,' I says, 'Before they get all of my pasture out there.'"

As a result, Sackman was arrested and charged with waste of game meat. He forfeited a $50 bond on that charge.

About a week later, on May 5, 1965, Sackman wrote the Fish and Game Department in Missoula. He stated:

"Dear Sirs:

"Last spring I come down to see you and told you that the elk are causing me damage, grazing my early pasture. You told me I was doing the right thing letting you know about it first and if you don't do nothing about it I would have a right to kill the elk, you didn't do nothing about it so this spring I wrote to State Fish and Game in Helena and I so far had the same results. As you no doubt know I killed one elk last week cause they are doing me damage again and I notified you and your warden Miller come up and fined me $50.00 on top of all the damage I've had so far and am still having.

"Would you please let me know what I can legally do about these elk, I just don't think I want to let the elk get all my early pasture every spring and I feed my cattle hay.

"Tonight again, just before dark there was a bunch in my meadow. Last spring we counted sometimes 40 and more on the place in early morning or late evening, this spring is getting to be the same thing.

"Let me hear from you right away or sent me a permit to kill em, as I cannot afford to pay $50.00 fine for every elk that is causing me damage and I can't hardly afford to pasture elk and feed my cattle hay.

"Yours very truly,

"/ss/ Bill Sackman

"Ovando, Montana."

On May 7, 1965, he was written as follows:

"Dear Mr. Sackman:

"Receipt is acknowledged of your letter of May 5, 1965.

"We are sorry to hear that you are having elk damage at this time of the year. The weather has been a factor in keeping elk at lower elevations this spring.

"There is not a great deal we can do but we can try to drive the elk away from this immediate area. We will come up to your ranch on next Monday or Tuesday and contact you about the matter.

"Very truly yours,

"/s/ W. J. Everin
"District Supervisor."

From this point, in 1965, on, Sackman made several complaints. He admitted that each complaint was investigated by Fish and Game officers and the property examined each time. After Sackman's complaints of game damage, over 27 examinations were made by one Game Warden. Five Commission employees investigated the complaints at different times. The investigations revealed that only a few tufts of grass had been eaten and only nominal damage, if any, had occurred in a swampy area. Sackman refused offers of "scare devices." He posted his land against hunting. He joined in a petition opposing an extended elk hunting season in the Fall of 1965 because as the petition stated, "due to an already shortage of elk." The Commission used a salting program to lure away elk. The Commission hired a "herder" for 40 days and nights to herd elk from Sackman's property in the year 1966.

Sackman, the respondent here, puts the matter interestingly and picturesquely different in his brief. There he states:

"The testimony indicates the overwhelming chasm between the lone man of the soil trying to scratch a living from the uncompromisingly harsh country of Markham Mountain and

the comfortable and complacent minions of the Fish and Game Commission * * *"

And further: "* * * Their [game officials'] attitudes were summarized by the characterization that while things may be tough with you, I've really got trouble."

Finally, in February of 1967, Sackman filed suit against the Commission seeking a writ of mandate that prayed:

The Commission be ordered to:

(a) open a special elk season in Sackman's area;

(b) destroy the game causing damage;

(c) authorize petitioners to kill a specified number of elk;

(d) costs of suit and attorney fees.

After trial and findings of fact, the trial court entered judgment against the State in the amount of $2,000.00 plus costs and attorney fees in the amount of $525.68 and also ordered that the Commission "authorize and permit Relators to kill or destroy such specified number of elk as are necessary to properly protect Relator's property * * *."

The Commission appealed, and lists eight specifications of error and reduces them to four issues. These issues are:

(1) Does R.C.M.1947, § 26-135, vest the Commission with discretionary power?

(2) Can mandamus control discretion?

(3) Was any material damage to Sackman's property proven? and

(4) Were damages justified when not prayed for in the complaint or was there evidence to support them?

We find the answers to the first two questions to be controlling here. The trial court filed a memorandum wherein it was said in part:

"In 1957, the Legislature enacted section 26-135, R.C.M.1947, as amended, after said Section 3729.1, Revised Codes of Montana, 1935, had been amended and repealed. Said section 26-135 provides that upon request or complaint of any landholder * * * that wild animals * * * are doing dam-

age to said property * * *, the State Fish and Game Department shall investigate and study the situation with respect to damage * * *. No discretion is given to the Commission. The Legislature purposely omitted from said section 26-135 any provisions of opinion or discretion. The Commission, [upon] property being damaged and complaint being made, may do one of three things. However, it is mandatory that the Commission do one of them."

R.C.M.1947, § 26-135, provides:

*"Wild animals damaging property—investigation—special season—destruction by commission—allowing holders of property to kill.* Upon the request or complaint of any landholder, or person in possession and having charge of any land in the state, that wild animals of the state, protected by the fish and game laws and regulations, are doing damage to the said property or crops thereon, the state fish and game department shall investigate and study the situation with respect to damage and depredation. The department may then decide to open a special season on the said game, or if the special season method be not feasible, then the department may destroy the animals causing the damage. Provided, further that the fish and game department may authorize and grant the holders of said property permission to kill or destroy a specified number of the animals causing the damage. Provided, further, no wild ferocious animal damaging property or endangering life shall be covered by this act."

Section 26-135 was enacted in 1957 as Chapter 60. The then section 26-135 was repealed. That section had been enacted in 1953 when the 1935 section 3729.1 referred to in the opinion of the trial court was repealed. The section 3729.1, R.C.M.1935, referred to reads as follows:

*"Power of commission to dispose of elk increased in numbers and damaging property.* That whenever elk, imported within the state of Montana, or any portion thereof, have increased in numbers to such an extent that in the judgment of the state

fish and game commission their number should be reduced, and special or private property is being actually or materially damaged or destroyed by said elk, and a written complaint of such damage has been filed by the owners or lessees of said property with the state fish and game commission, the said commission shall have the power and authority whenever, in its opinion, conditions warrant it, to take, kill, remove or dispose of such elk, or to permit the same to be taken, killed, removed, or disposed of under such rules, regulations and conditions as it may prescribe and promulgate."

The district court felt that section 3729.1 granted "discretion" to the Commission, but that section 26-135 somehow takes discretion away. This is erroneous. Section 26-135 contains but one command—that the Commission "shall investigate and study the situation with respect to damage and depredation." The Commission, "may then decide" to (1) open a special season; (2) destroy the animals; or (3) "May authorize * * * permission to kill or destroy a specified number of animals * * *." The language indicates flatly that an investigation shall be made, but that discretion to act remains. Clearly, if after investigation and study, no action is indicated, if no damage or depredation is found, for example, the Commission need do none of the three acts found in the statute. At this point, it would be a failure to exercise discretion, or an abuse of discretion that would allow a property owner an actionable right under the statute, or, put another way, the statute inherently contains a fourth alternative, viz., no action.

We have examined the legislative history of the present section 26-135 and find no indication of a legislative intent otherwise than the permissive language used.

 Therefore, the first issue posed is answered affirmatively, the Commission does have discretion.

 The second issue, can mandamus control discretion, is, of course, answered in the negative.

The matter of failure to exercise discretion or abuse of discretion is not alleged, nor was it the basis for any action by the trial court. (For cases on the limits of mandamus, see State ex rel. Anderson v. Giles, 119 Mont. 182, 172 P.2d 583; State ex rel. Sanders v. Hill, 141 Mont. 558, 381 P.2d 475, and State ex rel. Thompson v. Babcock, 147 Mont. 46, 409 P.2d 808.)

The law on game damage, aside from the statute, is laid out in State v. Rathbone, 110 Mont. 225, 242, 248, 100 P.2d 86, both as to the mandamus feature and game damage. We shall quote part of that opinion:

"Montana is one of the few areas ine the nation where wild game abounds. It is regarded as one of the greatest of the state's natural resources, as well as the chief attraction for visitors. Wild game existed here long before the coming of man. One who acquires property in Montana does so with notice and knowledge of the presence of wild game and presumably is cognizant of its natural habits. Wild game does not possess the power to distinguish between *fructus naturales* and *fructus industriales,* and cannot like domestic animals be controlled through an owner. Accordingly a property owner in this state must recognize the fact that there may be some injury to property or inconvenience from wild game for which there is no recourse.

"* * * Damage suffered by others in the county adjacent to defendant's ranch, and similarly situated, is also material as corroboration of defendant's judgment that the elk killed was capable of doing material damage."

Having held that the statute is permissive and that mandamus will not lie to control discretion, the judgment cannot stand, and the trial court erred in not granting the motion for nonsuit. Even though it is not necessary to discuss issues (3) and (4) as to damages, we shall comment that a fair reading of the testimony reveals no material damage at all. The only evidence of damage, as such, offered was the testimony

of the game warden as to a few tufts of grass eaten and a small amount of pawing in a swampy area. Other than this, Sackman speculated that, if it were not for the elk, he could graze 8 to 10 more calves. The evidence revealed numerous complaints by Sackman, it is true, but the activity of Commission personnel was commendable. They responded and investigated, but even Sackman could not point out any substantial damage.

We think two comments on the law, in addition to the previous quotation from State v. Rathbone, are in order. In 38 C.J.S. Game § 10, p. 12, the author under notes 3 and 4 cites the Rathbone case, supra, as authority for the statement:

█ "However, the injury to property by wild animals must be of considerable extent to warrant killing out of season or contrary to law; a mere trespass is insufficient."

And, in Barrett v. State, 220 N.Y. 423, 116 N.E. 99, 100, L.R.A.1918C, 400, it is said:

"Wherever protection is accorded, harm may be done to the individual. Deer or moose may browse on his crops; mink or skunks kill his chickens; robins eat his cherries. In certain cases the Legislature may be mistaken in its belief that more good than harm is occasioned. But this is clearly a matter which is confided to its discretion. It exercises a governmental function for the benefit of the public at large, and no one can complain of the incidental injuries that may result."

By what has been heretofore said, the judgment must be reversed and the cause dismissed. It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES HASWELL, ADAIR and JOHN CONWAY HARRISON, concur.