BALDWIN ET AL. *v.* FISH AND GAME COMMISSION OF
MONTANA ET AL.

No. 76–1150.   Argued October 5, 1977—Decided May 23, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BURGER,
C. J., and STEWART, POWELL, REHNQUIST, and STEVENS, JJ., joined.
BURGER, C. J., filed a concurring opinion, *post,* p. 392.   BRENNAN, J., filed
a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post,*
p. 394.

*James H. Goetz* argued the cause and filed briefs for appellants.

*Paul A. Lenzini* argued the cause and filed a brief for appellees.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents issues, under the Privileges and Immunities Clause of the Constitution's Art. IV, § 2, and the Equal Protection Clause of the Fourteenth Amendment, as to the constitutional validity of disparities, as between residents and nonresidents, in a State's hunting license system.

## I

Appellant Lester Baldwin is a Montana resident. He also is an outfitter holding a state license as a hunting guide. The majority of his customers are nonresidents who come to Montana to hunt elk and other big game. Appellants Carlson, Huseby, Lee, and Moris are residents of Minnesota.[1] They have hunted big game, particularly elk, in Montana in past years and wish to continue to do so.

In 1975, the five appellants, disturbed by the difference in the kinds of Montana elk-hunting licenses available to nonresidents, as contrasted with those available to residents of the State, and by the difference in the fees the nonresident and the resident must pay for their respective licenses, instituted the present federal suit for declaratory and injunctive relief and for reimbursement, in part, of fees already paid. App. 18–29. The defendants were the Fish and Game Commission of the State of Montana, the Commission's director, and its five com-

---

[1] Montana statutorily defines one's place of residence. Mont. Rev. Codes Ann. § 83–303 (1966 and Supp. 1977). It imposes a durational requirement of six months for eligibility to receive a resident's hunting or fishing license. § 26–202.3 (2) (Supp. 1975). Appellants, other than Baldwin, make no claim to Montana residence and do not challenge §§ 83–303 and 26–202.3 (2) in any way. Tr. of Oral Arg. 39–40.

missioners. The complaint challenged the Montana elk-hunting licensing scheme specifically, and asserted that, as applied to nonresidents, it violated the Constitution's Privileges and Immunities Clause, Art. IV, § 2, and the Equal Protection Clause of the Fourteenth Amendment. A three-judge District Court was convened and, by a divided vote, entered judgment denying all relief to the plaintiff-appellants. *Montana Outfitters Action Group* v. *Fish & Game Comm'n,* 417 F. Supp. 1005 (Mont. 1976). We noted probable jurisdiction. 429 U. S. 1089 (1977).[2]

## II

The relevant facts are not in any real controversy and many of them are agreed:

A. For the 1975 hunting season, a Montana resident could purchase a license solely for elk for $4. The nonresident, however, in order to hunt elk, was required to purchase a combination license at a cost of $151; this entitled him to take one elk and two deer.[3]

For the 1976 season, the Montana resident could purchase a license solely for elk for $9. The nonresident, in order to hunt elk, was required to purchase a combination license at a cost of $225;[4] this entitled him to take one elk, one deer, one black bear, and game birds, and to fish with hook and line.[5] A

---

[2] We note, in passing, that most States charge nonresidents more than residents for hunting licenses. *E. g.,* Alaska Stat.. Ann. § 16.05.340 (1977); Colo. Rev. Stat. § 33–4–102 (Supp. 1976); Me. Rev. Stat. Ann., Tit. 12, § 2401 (Supp. 1977); Wis. Stat. §§ 29.10, 29.105, 29.109, 29.12 (Supp. 1977); Wyo. Stat. § 23.1–33 (Supp. 1977). Others are listed in the Appendix to the Brief for Appellees.

[3] 1973 Mont. Laws, ch. 408, § 1, and 1969 Mont. Laws, ch. 172, § 2.

[4] Mont. Rev. Codes Ann. §§ 26–202.1 (4) and (12), and 26–230 (Supp. 1977). A nonresident, however, could obtain a license restricted to deer for $51. §§ 26–202.1 (9) and 26–230.

[5] We were advised at oral argument that Montana's method of use of a combination license is unique among the States. Tr. of Oral Arg. 8. See Reply Brief for Appellants 29.

resident was not required to buy any combination of licenses, but if he did, the cost to him of all the privileges granted by the nonresident combination license was $30.[6] The nonresident thus paid 7½ times as much as the resident, and if the nonresident wished to hunt only elk, he paid 25 times as much as the resident.[7]

B. Montana, with an area of more than 147,000 square miles, is our fourth largest State. Only Alaska, Texas, and California, in that order, are larger. But its population is relatively small; in 1972 it was approximately 716,000.[8] Its 1974 per capita income was 34th among the 50 States. App. 56–57.

Montana maintains significant populations of big game, including elk, deer, and antelope. Tr. 191. Its elk population is one of the largest in the United States. Elk are prized by big-game hunters who come from near and far to pursue the animals for sport.[9] The quest for big game has grown in

---

[6] Mont. Rev. Codes Ann. §§ 26–202.1 (1), (2), and (4) and 26–230 (Supp. 1977).

[7] There are similar disparities between Montana resident and nonresident hunting licenses for all other game, except wild turkey and as to bowhunting. The present litigation, however, focuses only on licenses to hunt elk.

Disparity in rates has not been without criticism. U. S. Public Land Law Review Comm'n, One Third of the Nation's Land 174 (1970); Norman, Are Nonresident Hunters Getting a Fair Deal?, Outdoor Life, Sept. 1949, p. 21; Yeager, The Federal Take-Over, Montana Outdoors, Jan./Feb. 1975, p. 43; Editorial, Field & Stream, June 1974, p. 4.

[8] App. 56. Its estimated population in 1976 has been said to be 753,000. The World Almanac 695 (1978). Of the 50 States, Montana consistently has ranked 42d or lower in population since statehood. App. 56.

[9] It has been said that Montana is the State most frequently visited by nonresident hunters. All Outdoors, Michigan Natural Resources 27–28 (Sept.–Oct. 1975).

For the license year 1974–1975, Montana licensed hunters from each of the other 49 States, the District of Columbia, Puerto Rico, and 11 foreign countries. Defendants' Exhibit A, p. 8 (part of deposition of Don L. Brown). Approximately 43,500 nonresident hunting licenses for deer and

popularity. During the 10-year period from 1960 to 1970 licenses issued by Montana increased by approximately 67% for residents and by approximately 530% for nonresidents.[10] App. 56–57.

Owing to its successful management programs for elk, the State has not been compelled to limit the overall number of hunters by means of drawings or lotteries as have other States with harvestable elk populations. Tr. 243. Elk are not hunted commercially in Montana.[11] Nonresident hunters seek the animal for its trophy value; the trophy is the distinctive set of antlers. The interest of resident hunters more often may be in the meat. *Id.,* at 245. Elk are now found in the mountainous regions of western Montana and are gen-

---

elk were issued during that year. *Id.,* at 7. The District Court found that elk hunting is recreational in nature and, "except for a few residents who live in exactly the right place," expensive. 417 F. Supp., at 1009. There was testimony that for a typical seven-day elk hunt a nonresident spends approximately $1,250 *exclusive* of outfitter's fee and the hunting license. Tr. 283–284. Thus, while the nonresident combination license fee is not insubstantial, it appears to be a lesser part of the overall expense of the elk hunt.

[10] The number of nonresident big-game combination licenses is now restricted to 17,000 in any one license year. Mont. Rev. Codes Ann. § 26–202.1 (16)(f) (Supp. 1977). This limitation was imposed by 1975 Mont. Laws, ch. 546, § 1, effective May 1, 1976.

The number of nonresident hunters has not yet reached the 17,000 limit. There are no similar numerical limitations on resident elk or deer licenses.

[11] The District Court concluded: "The elk is not and never will be hunted commercially." 417 F Supp., at 1007. Appellants do not deny that the activity which they wish to pursue is pure sport. The hunter is entitled to take only one elk per year, Montana Department of Fish and Game, Deer, Elk, Bear, and Mountain Lion Regulations, Feb. 27, 1977, and statutory restrictions are placed on the buying and selling of game animals, or parts thereof, taken in Montana. Mont. Rev. Codes Ann. § 26–806 (1967).

The Supreme Court of Montana has said: "In Montana, big game hunting is a sport." *State ex rel. Visser* v. *Fish & Game Comm'n,* 150 Mont. 525, 531, 437 P. 2d 373, 376 (1968).

erally not encountered in the eastern two-thirds of the State where the plains prevail. *Id.*, at 9–10, 249. During the summer the animals move to higher elevations and lands that are largely federally owned. In the late fall they move down to lower privately owned lands that provide the winter habitat necessary to their survival. During the critical midwinter period elk are often supported by ranchers. *Id.*, at 46–47, 191, 285–286.[12]

Elk management is expensive. In regions of the State with significant elk population, more personnel time of the Fish and Game Commission is spent on elk than on any other species of big game. Defendant's Exhibit A, p. 9.

Montana has more than 400 outfitters who equip and guide hunting parties. Tr. 295. These outfitters are regulated and licensed by the State and provide services to hunters and fishermen. It is estimated that as many as half the nonresidents who hunt elk in western Montana utilize outfitters. *Id.*, at 248. Three outfitter-witnesses testified that virtually all their clients were nonresidents. *Id.*, at 141, 281, 307.

The State has a force of 70 game wardens. Each warden district covers approximately 2,100 square miles. *Id.*, at 234. To assist wardens in law enforcement, Montana has an "equal responsibility" statute. Mont. Rev. Codes Ann. § 26–906 (Supp. 1977). This law makes outfitters and guides equally responsible for unreported game-law violations committed by persons in their hunting parties. The outfitter thus, in a sense, is a surrogate warden and serves to bolster the State's warden force.

### III

In the District Court the majority observed that the elk once was a plains animal but now roams the mountains of

[12] "[A] property owner in this state must recognize the fact that there may be some injury to property or inconvenience from wild game for which there is no recourse." *State* v. *Rathbone*, 110 Mont. 225, 242, 100 P. 2d 86, 93 (1940).

central and western Montana. About 75% of the elk taken are killed on federal land. The animal's preservation depends upon conservation. 417 F. Supp., at 1007. The majority noted that the appellants conceded that Montana constitutionally may charge nonresidents more for hunting privileges than residents. *Id.,* at 1007–1008.[13] It concluded, however, that on the evidence presented the 7½-to-1 ratio in favor of the resident cannot be justified on any basis of cost allocation. *Id.,* at 1008.

After satisfying itself as to standing[14] and as to the existence of a justiciable controversy, and after passing comment upon the somewhat controversial subject of wild animal legal ownership, the court concluded that the State "has the power to manage and conserve the elk, and to that end to make such laws and regulations as are necessary to protect and preserve it." *Id.,* at 1009. In reaching this result, the majority examined the nature of the rights asserted by the plaintiffs. It observed that there were just too many people and too few elk to enable everyone to hunt the animals. "If the elk is to survive as a species, the game herds must be managed, and a vital part of the management is the limitation of the annual kill." *Ibid.* Various means of limitation were mentioned, as was the fact that any one control device might deprive a particular hunter of any possibility of hunting elk. The right asserted by the appellants was "no more than a chance to engage temporarily in a recreational activity in a sister state" and was "not fundamental." *Ibid.* Thus, it was not protected as a privilege and an immunity under the Constitution's Art. IV, § 2. The majority contrasted the nature

---

[13] The concession was repeated orally in this Court. Tr. of Oral Arg. 6.

[14] The District Court made no specific findings or conclusions about the standing of each of the five appellants. It ruled, however, that two of the nonresident plaintiff-appellants, Lee and Moris, had sufficient standing to maintain the suit. 417 F. Supp., at 1008. We agree, and find it unnecessary to make any further inquiry on standing. See *Doe* v. *Bolton,* 410 U. S. 179, 189 (1973).

of the asserted right with educational needs at the primary and college levels, citing *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973), and *Sturgis* v. *Washington,* 368 F. Supp. 38 (WD Wash.), summarily aff'd, 414 U. S. 1057 (1973), and said: "There is simply no nexus between the right to hunt for sport and the right to speak, the right to vote, the right to travel, the right to pursue a calling." 417 F. Supp., at 1009. It followed that it was necessary only to determine whether the system bears some rational relationship to legitimate state purposes. Then:

> "We conclude that where the opportunity to enjoy a recreational activity is created or supported by a state, where there is no nexus between the activity and any fundamental right, and where by its very nature the activity can be enjoyed by only a portion of those who would enjoy it, a state may prefer its residents over the residents of other states, or condition the enjoyment of the nonresident upon such terms as it sees fit." *Id.,* at 1010.

The dissenting judge took issue with the "ownership theory," and with any "special public interest" theory, and emphasized the absence of any cost-allocation basis for the license fee differential. He described the majority's posture as one upholding discrimination because political support was thereby generated, and took the position that invidious discrimination was not to be justified by popular disapproval of equal treatment. *Id.,* at 1012.

## IV

*Privileges and immunities.* Appellants strongly urge here that the Montana licensing scheme for the hunting of elk violates the Privileges and Immunities Clause [15] of Art. IV, § 2,

---

[15] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

of our Constitution. That Clause is not one the contours of which have been precisely shaped by the process and wear of constant litigation and judicial interpretation over the years since 1789. If there is any significance in the fact, the Clause appears in the so-called States' Relations Article, the same Article that embraces the Full Faith and Credit Clause, the Extradition Clause (also in § 2), the provisions for the admission of new States, the Territory and Property Clause, and the Guarantee Clause. Historically, it has been overshadowed by the appearance in 1868 of similar language in § 1 of the Fourteenth Amendment,[16] and by the continuing controversy and consequent litigation that attended that Amendment's enactment and its meaning and application.

The Privileges and Immunities Clause originally was not isolated from the Commerce Clause, now in the Constitution's Art. I, § 8. In the Articles of Confederation, where both Clauses have their source, the two concepts were together in the fourth Article.[17] See *Austin* v. *New Hampshire*, 420 U. S. 656, 660–661 (1975); *Lemmon* v. *People*, 20 N. Y. 562, 627 (1860) (opinion of Wright, J.). Their separation may have been an assurance against an anticipated narrow reading of

---

[16] "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[17] "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free' citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively . . . ."

the Commerce Clause. See *Ward* v. *Maryland,* 12 Wall. 418, 430–432 (1871).

Perhaps because of the imposition of the Fourteenth Amendment upon our constitutional consciousness and the extraordinary emphasis that the Amendment received, it is not surprising that the contours of Art. IV, § 2, cl. 1, are not well developed,[18] and that the relationship, if any, between the Privileges and Immunities Clause and the "privileges or immunities" language of the Fourteenth Amendment is less than clear. We are, nevertheless, not without some pronouncements by this Court as to the Clause's significance and reach. There are at least three general comments that deserve mention:

The first is that of Mr. Justice Field, writing for a unanimous Court in *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869). He emphasized nationalism, the proscription of discrimination, and the assurance of equality of all citizens within any State:

> "It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to

---

[18] For a description of four theories proffered as to the purpose of the Clause, see S. Doc. No. 92–82, pp. 831–832 (1973).

constitute the citizens of the United States one people as this." [19]

The second came 70 years later when Mr. Justice Roberts, writing for himself and Mr. Justice Black in *Hague* v. *CIO*, 307 U. S. 496, 511 (1939), summed up the history of the Clause and pointed out what he felt to be the difference in analysis in the earlier cases from the analysis in later ones:

> "As has been said, prior to the adoption of the Four-teenth Amendment, there had been no constitutional definition of citizenship of the United States, or of the rights, privileges, and immunities secured thereby or springing therefrom. . . .
>
> "At one time it was thought that this section recognized a group of rights which, according to the jurisprudence of the day, were classed as 'natural rights'; and that the purpose of the section was to create rights of citizens of the United States by guaranteeing the citizens of every State the recognition of this group of rights by every other State. Such was the view of Justice Washington.

---

[19] The opinion goes on to read:

"Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists.

"But the privileges and immunities secured to citizens of each State in the several States, by the provision in question, are those privileges and immunities which are common to the citizens in the latter States under their constitution and laws by virtue of their being citizens. Special privileges enjoyed by citizens in their own States are not secured in other States by this provision. It was not intended by the provision to give to the laws of one State any operation in other States. They can have no such operation, except by the permission, express or implied, of those States. The special privileges which they confer must, therefore, be enjoyed at home, unless the assent of other States to their enjoyment therein be given." 8 Wall., at 180–181.

"While this description of the civil rights of the citizens of the States has been quoted with approval, it has come to be the settled view that Article IV, § 2, does not import that a citizen of one State carries with him into another fundamental privileges and immunities which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy. The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own." (Footnotes omitted.)

The third and most recent general pronouncement is that authored by MR. JUSTICE MARSHALL for a nearly unanimous Court in *Austin* v. *New Hampshire,* 420 U. S. 656, 660–661 (1975), stressing the Clause's "norm of comity" and the Framers' concerns:

"The Clause thus establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment. The origins of the Clause do reveal, however, the concerns of central import to the Framers. During the preconstitutional period, the practice of some States denying to outlanders the treatment that its citizens demanded for themselves was widespread. The fourth of the Articles of Confederation was intended to arrest this centrifugal tendency with some particularity. . . .

. . . . .

"The discriminations at which this Clause was aimed were by no means eradicated during the short life of the Confederation, and the provision was carried over into the comity article of the Constitution in briefer form but with no change of substance or intent, unless it was

to strengthen the force of the Clause in fashioning a single nation." (Footnotes omitted.)

When the Privileges and Immunities Clause has been applied to specific cases, it has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States in their pursuit of common callings within the State, *Ward* v. *Maryland,* 12 Wall. 418 (1871); in the ownership and disposition of privately held property within the State, *Blake* v. *McClung,* 172 U. S. 239 (1898); and in access to the courts of the State, *Canadian Northern R. Co.* v. *Eggen,* 252 U. S. 553 (1920).

It has not been suggested, however, that state citizenship or residency may never be used by a State to distinguish among persons. Suffrage, for example, always has been understood to be tied to an individual's identification with a particular State. See, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330 (1972). No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State. *Kanapaux* v. *Ellisor,* 419 U. S. 891 (1974); *Chimento* v. *Stark,* 353 F. Supp. 1211 (NH), summarily aff'd, 414 U. S. 802 (1973). Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do. *Canadian Northern R. Co.* v. *Eggen, supra;* cf. *Sosna* v. *Iowa,* 419 U. S. 393 (1975); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally. Here we must

decide into which category falls a distinction with respect to access to recreational big-game hunting.

Many of the early cases embrace the concept that the States had complete ownership over wildlife within their boundaries, and, as well, the power to preserve this bounty for their citizens alone. It was enough to say "that in regulating the use of the common property of the citizens of [a] state, the legislature is [not] bound to extend to the citizens of all the other states the same advantages as are secured to their own citizens." *Corfield* v. *Coryell,* 6 F. Cas. 546, 552 (No. 3,230) (CC ED Pa. 1825). It appears to have been generally accepted that although the States were obligated to treat all those within their territory equally in most respects, they were not obliged to share those things they held in trust for their own people. In *Corfield,* a case the Court has described as "the first, and long the leading, explication of the [Privileges and Immunities] Clause," see *Austin* v. *New Hampshire,* 420 U. S., at 661, Mr. Justice Washington, sitting as Circuit Justice, although recognizing that the States may not interfere with the "right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal," [20] 6 F. Cas., at 552, none-

---

[20] It is possible that this is the language that Mr. Justice Roberts in the quotation, *supra,* at 381, from *Hague* v. *CIO,* 307 U. S., at 511, rather critically regarded as relating to "natural rights." We suspect, however, that he was referring to the more general preceding sentences in Mr. Justice Washington's opinion:

"The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and

theless concluded that access to oyster beds determined to be owned by New Jersey could be limited to New Jersey residents. This holding, and the conception of state sovereignty upon which it relied, formed the basis for similar decisions during later years of the 19th century. *E. g., McCready* v. *Virginia,* 94 U. S. 391 (1877); *Geer* v. *Connecticut,* 161 U. S. 519 (1896).[21] See *Rosenfeld* v. *Jakways,* 67 Mont. 558, 216 P. 776 (1923). In *Geer,* a case dealing with Connecticut's authority to limit the disposition of game birds taken within its boundaries, the Court roundly rejected the contention "that a State cannot allow its own people the enjoyment of the benefits of the property belonging to them in common, without at the same time permitting the citizens of other States to participate in that which they do not own." 161 U. S., at 530.

In more recent years, however, the Court has recognized that the States' interest in regulating and controlling those things they claim to "own," including wildlife, is by no means absolute. States may not compel the confinement of the benefits of their resources, even their wildlife, to their own people whenever such hoarding and confinement impedes

---

sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole." 6 F. Cas., at 551–552.

[21] The rationale of these cases seems not to have been affected by the adoption of the Fourteenth Amendment and the inclusion therein of a new protection for "the privileges or immunities of citizens of the United States." Appellants do not argue that the State of Montana has deprived them of anything to which they are entitled under this provision, so we need not consider here the relationship between the Fourteenth Amendment and the Privileges and Immunities Clause of Art. IV. See *Hague* v. *CIO,* 307 U. S., at 511 (opinion of Roberts, J.); *Slaughter-House Cases,* 16 Wall. 36 (1873); R. Howell, The Privileges and Immunities of State Citizenship (1918).

interstate commerce. *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928); *Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923); *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229 (1911). Nor does a State's control over its resources preclude the proper exercise of federal power. *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265 (1977); *Kleppe* v. *New Mexico,* 426 U. S. 529 (1976); *Missouri* v. *Holland,* 252 U. S. 416 (1920). And a State's interest in its wildlife and other resources must yield when, without reason, it interferes with a nonresident's right to pursue a livelihood in a State other than his own, a right that is protected by the Privileges and Immunities Clause. *Toomer* v. *Witsell,* 334 U. S. 385 (1948). See *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948).

Appellants contend that the doctrine on which *Corfield, McCready,* and *Geer* all relied has no remaining vitality. We do not agree. Only last Term, in referring to the "ownership" or title language of those cases and characterizing it "as no more than a 19th-century legal fiction," the Court pointed out that that language nevertheless expressed " 'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' " *Douglas* v. *Seacoast Products, Inc.,* 431 U. S., at 284, citing *Toomer* v. *Witsell,* 334 U. S., at 402. The fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests does not compel the conclusion that it is meaningless in their absence.

We need look no further than decisions of this Court to know that this is so. It is true that in *Toomer* v. *Witsell* the Court in 1948 struck down a South Carolina statute requiring nonresidents of the State to pay a license fee of $2,500 for each commercial shrimp boat, and residents to pay a fee of only $25, and did so on the ground that the statute violated the Privileges and Immunities Clause. *Id.,* at 395–403. See also *Mullaney* v. *Anderson,* 342 U. S. 415 (1952), another commercial-livelihood case. Less than three years, however, after the decision in *Toomer,* so heavily relied upon by appellants

here, the Court dismissed for the want of a substantial federal question an appeal from a decision of the Supreme Court of South Dakota holding that the *total* exclusion from that State of nonresident hunters of migratory waterfowl was justified by the State's assertion of a special interest in wildlife that qualified as a substantial reason for the discrimination. *State* v. *Kemp,* 73 S. D. 458, 44 N. W. 2d 214 (1950), appeal dismissed, 340 U. S. 923 (1951). In that case South Dakota had proved that there was real danger that the flyways, breeding grounds, and nursery for ducks and geese would be subject to excessive hunting and possible destruction by nonresident hunters lured to the State by an abundance of pheasants. 73 S. D., at 464, 44 N. W. 2d, at 217.

Appellants have demonstrated nothing to convince us that we should completely reject the Court's earlier decisions. In his opinion in *Coryell,* Mr. Justice Washington, although he seemingly relied on notions of "natural rights" when he considered the reach of the Privileges and Immunities Clause, included in his list of situations, in which he believed the States would be obligated to treat each other's residents equally, only those where a nonresident sought to engage in an essential activity or exercise a basic right. He himself used the term "fundamental," 6 F. Cas., at 551, in the modern as well as the "natural right" sense. Certainly Mr. Justice Field and the Court invoked the same principle in the language quoted above from *Paul* v. *Virginia,* 8 Wall., at 180. So, too, did the Court by its holdings in *Ward* v. *Maryland, Canadian Northern R. Co.* v. *Eggen,* and *Blake* v. *McClung,* all *supra,* when it was concerned with the pursuit of common callings, the ability to transfer property, and access to courts, respectively. And comparable status of the activity involved was apparent in *Toomer,* the commercial-licensing case. With respect to such basic and essential activities, interference with which would frustrate the purposes of the formation of the Union, the States must treat residents and nonresidents without unnecessary distinctions.

Does the distinction made by Montana between residents and nonresidents in establishing access to elk hunting threaten a basic right in a way that offends the Privileges and Immunities Clause? Merely to ask the question seems to provide the answer. We repeat much of what already has been said above: Elk hunting by nonresidents in Montana is a recreation and a sport. In itself—wholly apart from license fees—it is costly and obviously available only to the wealthy nonresident or to the one so taken with the sport that he sacrifices other values in order to indulge in it and to enjoy what it offers. It is not a means to the nonresident's livelihood. The mastery of the animal and the trophy are the ends that are sought; appellants are not totally excluded from these. The elk supply, which has been entrusted to the care of the State by the people of Montana, is finite and must be carefully tended in order to be preserved.

Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a nonresident's participation therein without similarly interfering with a resident's participation. Whatever rights or activities may be "fundamental" under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them.

V

*Equal protection.* Appellants urge, too, that distinctions drawn between residents and nonresidents are not permissible under the Equal Protection Clause of the Fourteenth Amend-

ment when used to allocate access to recreational hunting. Appellees argue that the State constitutionally should be able to charge nonresidents, who are not subject to the State's general taxing power, more than it charges its residents, who are subject to that power and who already have contributed to the programs that make elk hunting possible. Appellees also urge that Montana, as a State, has made sacrifices in its economic development, and therefore in its tax base, in order to preserve the elk and other wildlife within the State and that this, too, must be counted, along with actual tax revenues spent, when computing the fair share to be paid by nonresidents. We need not commit ourselves to any particular method of computing the cost to the State of maintaining an environment in which elk can survive in order to find the State's efforts rational, and not invidious, and therefore not violative of the Equal Protection Clause.

A repetitious review of the factual setting is revealing: The resident obviously assists in the production and maintenance of big-game populations through taxes. The same taxes provide support for state parks utilized by sportsmen, Plaintiffs' Exhibit 1; for roads providing access to the hunting areas, Tr. 156–158, 335; for fire suppression to protect the wildlife habitat, id., at 167; for benefits to the habitat effected by the State's Environmental Quality Council, id., at 163–165; for the enforcement of state air and water quality standards, id., at 223–224; for assistance by sheriffs' departments to enforce game laws, Defendants' Exhibit G, p. 13; and for state highway patrol officers who assist wildlife officers at game checking stations and in enforcement of game laws. Forage support by resident ranchers is critical for winter survival. Tr. 46–47, 286. All this is on a continuing basis.

On the other side of the same ledger is the great, and almost alarming, increase in the number of nonresident hunters—in the decade of the 1960's, almost eight times the increase in resident hunters; the group character of much non-

resident hunting, with its opportunity for license "swapping" when the combination license system is not employed, *id.*, at 237; [22] the intermingling of deer and elk in the wild and the inexperienced hunter's inability to tell one from the other; the obvious limit in the elk supply; the supposition that the nonresident occasional and short-term visitor is more likely to commit game-law violations; the need to supervise hunting practices in order to prevent violations and illegal overkill; and the difficulties of supervision in the primitive areas where the elk is found during the hunting season.

All this adds up, in our view, to no irrationality in the differences the Montana Legislature has drawn in the costs of its licenses to hunt elk. The legislative choice was an economic means not unreasonably related to the preservation of a finite resource and a substantial regulatory interest of the State. It serves to limit the number of hunter days in the Montana elk country. There is, to be sure, a contrasting cost feature favorable to the resident, and, perhaps, the details and the figures might have been more precisely fixed and more closely related to basic costs to the State. But, as has been noted, appellants concede that a differential in cost between residents and nonresidents is not in itself invidious or unconstitutional. And "a statutory classification impinging upon no fundamental interest . . . need not be drawn so as to fit with precision the legitimate purposes animating it. . . . That [Montana] might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional." *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 813 (1976).[23]

---

[22] It is, of course, possible for residents, with single-animal licenses, hunting in groups to engage in license swapping.

[23] The appellants point to the facts that federal land in Montana provides a significant contribution to the elk habitat, and that substantial apportionments to the State flow from the Federal Aid in the Wild Life Restoration Act, 50 Stat. 917, as amended, 16 U. S. C. §§ 669–669i (1976

Appellants also contend that the requirement that non-resident, but not resident, hunters must purchase combination licenses in order to be able to obtain a single elk is arbitrary. In the District Court the State introduced evidence, largely uncontradicted, that nonresident hunters create greater enforcement problems and that some of these problems are alleviated by this requirement. The District Court's majority appears to have found this evidence credible and the justification rational, and we are in no position to disagree. Many of the same factors just listed in connection with the license fee differential have equal pertinency for the combination license requirement. We perceive no duty on the State to have its licensing structure parallel or identical for both residents and nonresidents, or to justify to the penny any cost differential it imposes in a purely recreational, noncommercial, nonlivelihood setting. Rationality is sufficient. That standard, we feel, has been met by Montana. So long as constitutional requirements have been met, as we conclude is the case here, "[p]rotection of the wild life of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection." *Lacoste* v. *Department of Conservation,* 263 U. S. 545, 552 (1924).[24]

---

ed.). We fail to see how these federal aspects transform a recreational pursuit into a fundamental right protected by the Privileges and Immunities Clause, or how they impose a barrier to resident-nonresident differen- . tials. Congress knows how to impose such a condition on its largess when it wishes to do so. See 16 U. S. C. § 669 (1976 ed.). See also Pub. L. 94–422, 90 Stat. 1314, adding § 6 (f) (8) to the Land and Water Conservation Fund Act of 1965, 16 U. S. C. § 460*l*–8 (f) (8) (1976 ed.).

[24] The dissenting opinion in the District Court ascribes to the majority there a holding that "an otherwise invidious discrimination against nonresidents is justified because the state may rationally consider the discrimination necessary to induce residents to support the state program required to conserve the herd." 417 F. Supp., at 1011. We agree with that dissent that the State's need or desire to engender political support for its conservation programs cannot by itself justify an otherwise invidi-

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

In joining the Court's opinion I write separately only to emphasize the significance of Montana's special interest in its elk population and to point out the limits of the Court's holding.

The doctrine that a State "owns" the wildlife within its borders as trustee for its citizens, see *Geer* v. *Connecticut,* 161 U. S. 519 (1896), is admittedly a legal anachronism of sorts. See *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265, 284 (1977). A State does not "own" wild birds and animals in the same way that it may own other natural resources such as land, oil, or timber. But, as noted in the Court's opinion, *ante,* at 386, and contrary to the implications of the dissent, the doctrine is not completely obsolete. It manifests the State's special interest in regulating and preserving wildlife for the benefit of its citizens. See *Douglas* v. *Seacoast Products, Inc., supra,* at 284, 287. Whether we describe this interest as proprietary or otherwise is not significant.

We recognized in *Toomer* v. *Witsell,* 334 U. S. 385, 401–402 (1948), that the doctrine does not apply to migratory shrimp located in the three-mile belt of the marginal sea. But the elk involved in this case are found within Montana and remain primarily within the State. As such they are natural resources of the State, and Montana citizens have a legitimate interest in preserving their access to them. The Court acknowledges this interest when it points out that the Montana elk supply "has been entrusted to the care of the State by the people of Montana," *ante,* at 388, and asserts the continued vitality of

ous classification. *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 266 (1974). But, in our view, the record, that is, the case as proved, discloses that the classification utilized in Montana's licensing scheme is not "otherwise invidious discrimination."

the doctrine upon which the court relied in *Corfield* v. *Coryell,* 6 F. Cas. 546, 552 (No. 3,230) (CC ED Pa. 1825); *McCready* v. *Virginia,* 94 U. S. 391 (1877); and *Geer* v. *Connecticut, supra.* See *ante,* at 386.

*McCready* v. *Virginia, supra,* made it clear that the Privileges and Immunities Clause does not prevent a State from preferring its own citizens in granting public access to natural resources in which they have a special interest. Thus Montana does not offend the Privileges and Immunities Clause by granting residents preferred access to natural resources that do not belong to private owners. And Montana may give its residents preferred access to Montana elk without offending the Privileges and Immunities Clause.

It is not necessary to challenge the cases cited by the dissent, *post,* at 405, which make clear that a State does not have absolute freedom to regulate the taking of wildlife within its borders or over its airspace. A State may not regulate the killing of migratory game birds in a way that frustrates a valid treaty of the United States entered into pursuant to the Art. II, § 2, treaty power, *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920); it may not regulate wild animals found on federal lands in a way that conflicts with federal statutes enacted under the Property Clause, Art. IV, § 3, cl. 2, *Kleppe* v. *New Mexico,* 426 U. S. 529, 546 (1976); nor may it allocate access to its wildlife in a manner that offends the Fourteenth Amendment. *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410 (1948). Once wildlife becomes involved in interstate commerce, a State may not restrict the use of or access to that wildlife in a way that burdens interstate commerce. *Douglas* v. *Seacoast Products, Inc., supra,* at 281–282; *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928). None of those cases hold that the Privileges and Immunities Clause prevents a State from preferring its own citizens in allocating access to wildlife within that State.

It is the special interest of Montana citizens in its elk that

permits Montana to charge nonresident hunters higher license fees without offending the Privileges and Immunities Clause. The Court does not hold that the Clause permits a State to give its residents preferred access to recreational activities offered for sale by private parties. Indeed it acknowledges that the Clause requires equality with respect to privileges "bearing upon the vitality of the Nation as a single entity." *Ante,* at 383. It seems clear that those basic privileges include "all the privileges of trade and commerce" which were protected in the fourth Article of the Articles of Confederation. See *Austin* v. *New Hampshire,* 420 U. S. 656, 660–661, and n. 6 (1975). The Clause assures noncitizens the opportunity to purchase goods and services on the same basis as citizens; it confers the same protection upon the buyer of luxury goods and services as upon the buyer of bread.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

Far more troublesome than the Court's narrow holding—elk hunting in Montana is not a privilege or immunity entitled to protection under Art. IV, § 2, cl. 1, of the Constitution—is the rationale of the holding that Montana's elk-hunting licensing scheme passes constitutional muster. The Court concludes that because elk hunting is not a "basic and essential activit[y], interference with which would frustrate the purposes of the formation of the Union," *ante,* at 387, the Privileges and Immunities Clause of Art. IV, § 2—"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States"—does not prevent Montana from irrationally, wantonly, and even invidiously discriminating against nonresidents seeking to enjoy natural treasures it alone among the 50 States possesses. I cannot agree that the Privileges and Immunities Clause is so impotent a guarantee that such discrimination remains wholly beyond the purview of that provision.

## I

It is true that because the Clause has not often been the subject of litigation before this Court, the precise scope of the protection it affords the citizens of each State in their sister States remains to be defined. Much of the uncertainty is, no doubt, a product of Mr. Justice Washington's exposition of its scope in *Corfield* v. *Coryell,* 6 F. Cas. 546, 551 (No. 3,230) (CC ED Pa. 1825), where he observed:-

> "[W]hat are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; *which belong, of right, to the citizens of all free governments;* and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign." (Emphasis added.)

Among these "fundamental" rights he included "[p]rotection by the government; . . . [t]he right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state." *Id.,* at 551–552. These rights, only the last of which was framed in terms of discriminatory treatment, were to be enjoyed *"by the citizens of each state, in every other state . . . ." Id.,* at 552. As both the italicized language and the list of rights designed as falling within the compass of Art. IV, § 2, cl. 1, make clear, Mr. Justice Washington believed that the Clause was designed to guarantee certain "fundamental" rights to all United States citizens, regardless of the rights afforded by a State to its own

citizens. In *Hague* v. *CIO,* 307 U. S. 496, 511 (1939), Mr. Justice Roberts so characterized Mr. Justice Washington's view: "At one time it was thought that [Art. IV, § 2, cl. 1] recognized a group of rights which, according to the jurisprudence of the day, were classed as 'natural rights'; and that the purpose of the section was to create rights of citizens of the United States by guaranteeing the citizens of every State the recognition of this group of rights by every other State. Such was the view of Justice Washington."

That Mr. Justice Washington thought Art. IV, § 2, cl. 1, to embody a guarantee of "natural rights" is not surprising. It revealed his preference for that determination of the controversy raging in his time over the significance of "natural rights" in constitutional adjudication.

> "Behind the 1825 *Corfield* opinion lay the nineteenth century controversy over the status of 'natural rights' in constitutional litigation. Some judges had supposed an inherent limitation on state and federal legislation that compelled courts to strike down any law 'contrary to the first great principles of the social compact.' They were the proponents of the natural rights doctrine which, without specific constitutional moorings, posited 'certain vital principles in our free republican governments, which will determine and overrule an apparent abuse of legislative powers.'
>
> "*Corfield* can be understood as an attempt to import the natural rights doctrine into the Constitution by way of the privileges and immunities clause of article IV. By attaching the fundamental rights of state citizenship to the privileges and immunities clause, Justice Washington would have created federal judicial protection against state encroachment upon the 'natural rights' of citizens."
> L. Tribe, American Constitutional Law 405–406 (1978) (footnotes omitted).

What *is* surprising, however, is the extent to which *Corfield's*

view of the Clause as protecting against governmental encroachment upon "natural rights" continued to influence interpretation of the Clause [1] even after Mr. Justice Washington's view was seemingly discarded in *Paul* v. *Virginia*, 8 Wall. 168 (1869), and replaced by the view that the measure of the rights secured to nonresidents [2] was the extent of the rights afforded by a State to its own citizens. *Paul* announced that "[i]t was undoubtedly the object of the clause . . . to place the citizens of each State upon the same footing with citizens of other States, *so far as the advantages resulting from citizenship in those States are concerned." Id.,* at 180 (emphasis added). But during the 79 years between *Paul* and our decision in *Toomer* v. *Witsell,* 334 U. S. 385 (1948), Art. IV, § 2, cl. 1, was given an anomalous and unduly restrictive scope. Mr. Justice Washington's expansive interpretation of "privileges and immunities" as broadly insuring a host of rights against *all* government interference was superimposed on *Paul's* conception of the Clause as prohibiting a State from unjustifiably discriminating against nonresidents—a view of Art. IV, § 2, cl. 1, that I think correct—with the result that the Clause's guarantee was held to prohibit a State from denying to citizens of other States only those "fundamental" rights that it guaranteed to its own citizens. Cf. *Minor* v. *Happersett,* 21 Wall. 162, 174 (1875). Yet because nonresidents could present special problems for a State in the administration of its laws even where rights thought to be "fundamental" were involved, this conception of Art. IV, § 2, cl. 1, born of the commingling of two disparate views of the Clause that

---

[1] See, *e. g., Canadian Northern R. Co.* v. *Eggen,* 252 U. S. 553, 560 (1920); *Chambers* v. *Baltimore & Ohio R. Co.,* 207 U. S. 142, 155 (1907); *Blake* v. *McClung,* 172 U. S. 239, 248–249 (1898).

[2] For the purpose of analysis of most cases under the Privileges and Immunities Clause of Art. IV, the terms "citizen" and "resident" are "essentially interchangeable." *Austin* v. *New Hampshire,* 420 U. S. 656, 662 n. 8 (1975); *Toomer* v. *Witsell,* 334 U. S. 385, 397 (1948).

were never meant to mate, proved difficult of rigid application. Thus, although Mr. Justice Washington listed the right "to institute and maintain actions of any kind in the courts of the state" as one of the "fundamental" rights within the ambit of Art. IV, § 2, cl. 1, *Corfield* v. *Coryell, supra,* at 552, this Court upheld state statutes that denied nonresidents precisely the same access to state courts as was guaranteed residents. *Chemung Canal Bank* v. *Lowery,* 93 U. S. 72 (1876), for example, upheld a Wisconsin statute that tolled the statute of limitations on a cause of action against a defendant absent from the State only when the plaintiff was a Wisconsin resident; the ground was that "[t]here is, in fact, a valid reason for the discrimination." *Id.,* at 77.[3] Similarly, *Canadian Northern R. Co.* v. *Eggen,* 252 U. S. 553 (1920), sanctioned a Minnesota provision that allowed only citizens of that State to sue in state court on a cause of action arising out of the State that would have been barred by the statute of limitations in the State where the cause of action arose. The Court found that such a statute did not, in the words of *Blake* v. *McClung,* 172 U. S. 239, 256 (1898), " 'materially interfer[e] with the enjoyment by citizens of each State of the privileges and immunities secured by the Constitution to citizens of the several States.' " *Canadian Northern R. Co.* v. *Eggen, supra,* at 562.

Mr. Justice Roberts' analysis of the Privileges and Immunities Clause of Art. IV, § 2, in *Hague* v. *CIO, supra,* was the first noteworthy modern pronouncement on the Clause from

---

[3] The reason given was: "If the statute does not run as between non-resident creditors and their debtors, it might often happen that a right of action would be extinguished, perhaps for years, in the State where the parties reside; and yet, if the defendant should be found in Wisconsin,—it may be only in a railroad train,—a suit could be sprung upon him after the claim had been forgotten. The laws of Wisconsin would thus be used as a trap to catch the unwary defendant, after the laws which had always governed the case had barred any recovery. This would be inequitable and unjust." 93 U. S., at 77.

this Court. Not only did Mr. Justice Roberts recognize that *Corfield*'s view of the Privileges and Immunities Clause might, and should be, properly interred as the product of a bygone era, but also he went on to emphasize the interpretation of the scope of the Clause proposed in *Paul* v. *Virginia, supra,* namely, that "[t]he section, in effect, prevents a State from discriminating against citizens of other States in favor of its own." 307 U. S., at 511. In singling out this passage as one of "three general comments [on the Clause] that deserve mention," *ante,* at 380, the Court acknowledges the significance of Mr. Justice Roberts' statement, but, with all respect, errs in not also appreciating that the Roberts statement signaled the complete demise of the Court's acceptance of *Corfield*'s definition of the type of rights encompassed by the phrase "privileges and immunities." No longer would that definition be controlling, or even relevant, in evaluating whether the discrimination visited by a State on nonresidents vis-à-vis its own citizens passed constitutional muster.

Less than a decade after *Hague, Toomer* v. *Witsell, supra,* embraced and applied the Roberts interpretation of the Clause. In *Toomer,* a South Carolina statute that required nonresidents to pay a fee 100 times greater than that paid by residents for a license to shrimp commercially in the three-mile maritime belt off the coast of that State was held to be violative of the Clause. After stating that the Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy," 334 U. S., at 395, the Court set out the standard against which a State's differential treatment of nonresidents would be evaluated.

> "Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States *where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other*

*States.* But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Id.,* at 396 (emphasis added) (footnote omitted).

Unlike the relatively minimal burden of rationality South Carolina would have had to satisfy in defending a law not infringing on a "fundamental" interest against an equal protection attack, see *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976), the State could not meet the plaintiffs' privileges and immunities challenge simply by asserting that the discrimination was a rational means for fostering a legitimate state interest. Instead, even though an important state objective—conservation—was at stake, *Toomer* held that a classification based on the fact of noncitizenship was constitutionally infirm "unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." 334 U. S., at 398. Moreover, even where the problem the State is attempting to remedy is linked to the presence or activity of nonresidents in the State, the Clause requires that there be "a reasonable relationship between the danger represented by non-citizens, as a class, and the . . . discrimination practiced upon them." *Id.,* at 399.

*Toomer* was followed in *Mullaney* v. *Anderson,* 342 U. S. 415 (1952). In *Mullaney,* the scheme employed by the Territorial Legislature of Alaska for the licensing of commercial fishermen in territorial waters, which imposed a $5 license fee on resident fishermen and a $50 fee on nonresidents, was found invalid under the Clause. Although the Court reaffirmed its observation in *Toomer* that a State may "charge non-residents a

differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay," 342 U. S., at 417, the Court found that Alaska's mere assertion of these justifications was insufficient to sustain the fee differential in licensing in the face of evidence that, in the case under review, the justifications had no basis in fact.

Neither *Toomer* nor *Mullaney* cited *Corfield* or discussed whether commercial fishing was the type of "fundamental" right entitled to protection under Mr. Justice Washington's view of the Privileges and Immunities Clause. Although the Court in *Toomer* did "hold that commercial shrimping in the marginal sea, like other common callings, is within the privileges and immunities clause," 334 U. S., at 403, its statement to this effect was conclusory and clearly secondary to its extensive analysis of whether South Carolina's discrimination against nonresidents was properly justified. The State's justification for its discrimination against nonresidents was also the focus of the privileges and immunities analysis in *Doe* v. *Bolton,* 410 U. S. 179 (1973), which summarily added "medical services" to the panoply of privileges protected by the Clause and held invalid a Georgia law permitting only Georgia residents to obtain abortions within that State.[4] It is true that *Austin* v. *New Hampshire,* 420 U. S. 656 (1975), cited *Corfield* for the proposition that discriminatory taxation of the nonresident was one of the evils the Clause was designed to protect against; but "an exemption from higher taxes" was the one privileges and immunities right that Mr. Justice Washington framed in terms of discriminatory treatment. As in *Toomer, Mullaney,* and *Bolton,* the Court's

---

[4] Although it is true that a woman's right to choose to have an abortion is "fundamental" for purposes of equal protection analysis, *Roe* v. *Wade,* 410 U. S. 113 (1973), the Court did not rely on this fact and deemed all "medical services" within the protection of the Clause. Again no mention was made of *Corfield.*

principal concern in *Austin* was the classification itself—the fact that the discrimination hinged on the status of nonresidency.

I think the time has come to confirm explicitly that which has been implicit in our modern privileges and immunities decisions, namely that an inquiry into whether a given right is "fundamental" has no place in our analysis of whether a State's discrimination against nonresidents—who "are not represented in the [discriminating] State's legislative halls," *Austin* v. *New Hampshire, supra,* at 662—violates the Clause. Rather, our primary concern is the State's justification for its discrimination. Drawing from the principles announced in *Toomer* and *Mullaney,* a State's discrimination against nonresidents is permissible where (1) the presence or activity of nonresidents is the source or cause of the problem or effect with which the State seeks to deal, and (2) the discrimination practiced against nonresidents bears a substantial relation to the problem they present. Although a State has no burden to prove that its laws are not violative of the Privileges and Immunities Clause, its mere assertion that the discrimination practiced against nonresidents is justified by the peculiar problem nonresidents present will not prevail in the face of a prima facie showing that the discrimination is not supportable on the asserted grounds. This requirement that a State's unequal treatment of nonresidents be reasoned and suitably tailored furthers the federal interest in ensuring that "a norm of comity," *Austin* v. *New Hampshire, supra,* at 660, prevails throughout the Nation while simultaneously guaranteeing to the States the needed leeway to draw viable distinctions between their citizens and those of other States.

## II

It is clear that under a proper privileges and immunities analysis Montana's discriminatory treatment of nonresident big-game hunters in this case must fall. Putting aside the

validity of the requirement that nonresident hunters desiring to hunt elk must purchase a combination license that resident elk hunters need not buy, there are three possible justifications for charging nonresident elk hunters an amount at least 7.5 times the fee imposed on resident big-game hunters.[5] The first is conservation. The State did not attempt to assert this as a justification for its discriminatory licensing scheme in the District Court, and apparently does not do so here. Indeed, it is difficult to see how it could consistently with the first prong of a modern privileges and immunities analysis. First, there is nothing in the record to indicate that the influx of nonresident hunters created a special danger to Montana's elk or to any of its other wildlife species. In the most recent year for which statistics are available, 1974–1975, there were 198,411 resident hunters in Montana and only 31,406 nonresident hunters. Nonresidents thus constituted only 13% of all hunters pursuing their sport in the State.[6] Moreover, as the Court recognizes, *ante,* at 375 n. 10, the number of nonresident *big-game* hunters has never approached the 17,000 limit set by statute, presumably as a precautionary conservation measure.[7] Second, if Montana's discriminatorily high big-game license fee is an outgrowth of general conservation policy to discourage elk hunting, this too fails as a basis for the licensing scheme.

[5] This is the cost ratio of the 1976 nonresident combination license fee ($225) to the 1976 resident combination license fee ($30). Since a Montana resident wishing to hunt only elk could purchase an elk-hunting license for only $9, a nonresident who wanted to hunt only elk had to pay a fee 25 times as great as that charged a similarly situated resident of Montana.

[6] These are the figures for all hunters in Montana, not only for those hunting elk. The Court's notation of the fact that the number of nonresident hunters in Montana has increased more dramatically than the number of resident hunters during the past decade, *ante,* at 374–375, thus somewhat overstates the putative conservation threat nonresident hunters pose for Montana's wildlife.

[7] This restriction on the number of big-game hunters allowed into Montana is thus not at issue.

Montana makes no effort similarly to inhibit its own residents. As we said in *Douglas* v. *Seacoast Products, Inc.*, 431 U. S. 265, 285 n. 21 (1977), "[a] statute that leaves a State's residents free to destroy a natural resource while excluding aliens or nonresidents is not a conservation law at all."

The second possible justification for the fee differential Montana imposes on nonresident elk hunters—the one presented in the District Court and principally relied upon here—is a cost justification. Appellants have never contended that the Privileges and Immunities Clause requires that identical fees be assessed residents and nonresidents. They recognize that *Toomer* and *Mullaney* allow additional charges to be made on nonresidents based on both the added enforcement costs the presence of nonresident hunters imposes on Montana and the State's conservation expenditures supported by resident-borne taxes. Their position throughout this litigation has been that the higher fee extracted from nonresident elk hunters is not a valid effort by Montana to recoup state expenditures on their behalf, but a price gouged from those who can satisfactorily pursue their avocation in no other State in the Union. The licensing scheme, appellants contend, is simply an attempt by Montana to shift the costs of its conservation efforts, however commendable they may be, onto the shoulders of nonresidents who are powerless to help themselves at the ballot box. The District Court agreed, finding that "[o]n a consideration of [the] evidence . . . and with due regard to the presumption of constitutionality . . . the ratio of 7.5 to 1 cannot be justified on any basis of cost allocation." *Montana Outfitters Action Group* v. *Fish & Game Comm'n*, 417 F. Supp. 1005, 1008 (Mont. 1976). This finding is not clearly erroneous, *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 394–395 (1948), and the Court does not intimate otherwise. Montana's attempt to cost-justify its discriminatory licensing practices thus fails under the second prong of a correct privileges and immunities

analysis—that which requires the discrimination a State visits upon nonresidents to bear a substantial relation to the problem or burden they pose.

The third possible justification for Montana's licensing scheme, the doctrine of *McCready* v. *Virginia,* 94 U. S. 391 (1877), is actually no justification at all, but simply an assertion that a State "owns" the wildlife within its borders in trust for its citizens and may therefore do with it what it pleases. See *Geer* v. *Connecticut,* 161 U. S. 519 (1896). The lingering death of the *McCready* doctrine as applied to a State's wildlife, begun with the thrust of Mr. Justice Holmes' blade in *Missouri* v. *Holland,* 252 U. S. 416, 434 (1920) ("[t]o put the claim of the State upon title is to lean upon a slender reed") and aided by increasingly deep twists of the knife in *Foster Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 11–14 (1928); *Toomer* v. *Witsell,* 334 U. S., at 402; *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 421 (1948); and *Kleppe* v. *New Mexico,* 426 U. S. 529, 545–546 (1976), finally became a reality in *Douglas* v. *Seacoast Products, Inc., supra,* at 284, where MR. JUSTICE MARSHALL, speaking for the Court, observed:

> "A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. . . . The 'ownership' language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing 'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' *Toomer* v. *Witsell,* 334 U. S., at 402 . . . . Under modern analysis, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution."

406

In unjustifiably discriminating against nonresident elk hunters, Montana has not "exercised its police power in conformity with the . . . Constitution." The State's police power interest in its wildlife cannot override the appellants' constitutionally protected privileges and immunities right. I respectfully dissent and would reverse.[8]

---

[8] Because I find Montana's elk-hunting licensing scheme unconstitutional under the Privileges and Immunities Clause of Art. IV, § 2, I find it unnecessary to determine whether the scheme would pass equal protection scrutiny. In any event, where a State discriminates *solely* on the basis of noncitizenship or nonresidency in the State, see n. 1, *supra*, it is my view that the Equal Protection Clause affords a discriminatee no greater protection than the Privileges and Immunities Clause.