OPINION OF THE COURT
Thomas F. Liotti, J.
The defendant is charged with a violation of Vehicle and Traffic Law § 509 (1), unlicensed operation of a motor vehicle, and Vehicle and Traffic Law § 319 (1), failure to provide proof of valid insurance. The potential penalties are minimal.[1] I have asked both the prosecutor and defense counsel to prepare prepleading memos on what sentence I might impose, including jail.
I. Background
In the 17 years that I have been a village justice I have sentenced only one defendant to jail and it was on a case like this.[2] It was a 15-day sentence. The defendant here is not a citizen of the United States of America and is presumably here illegally. He has multiple convictions for unlicensed operation in Nassau County.[3] The unlicensed operation of motor vehicles constitutes a serious problem that pervades not just New York, but the entire country. Governor Spitzer’s recent proposal[4] to afford licenses to noncitizens has caused his popularity to plum *733 met and many candidates for national office to reject his plan.[5] I supported the proposal because noncitizens would have to pay application and licensing fees and take our driving tests. More vehicles would be properly registered and insurance obtained. The proposal was withdrawn by the Governor on November 14, 2007 — not because it was a bad idea, but because of political opposition to the plan.[6] Safety and economic revenue were my concerns at the time and still are my concerns.[7] The debate has needlessly metastasized from one about safety on our highways to one involving the politics of immigration.
This decision is predicated upon a concern for public safety and a concern that laws as presently constituted do not address the issue of safety on our highways. Instead of dealing with this issue as one concerning our highways, public officials have transformed this highly legitimate concern into a debate on flawed immigration policies.[8] This court sees little nexus between whatever the immigration status of defendants may be and their qualifications for obtaining driving licenses.[9] Those who may be here illegally will drive and operate vehicles out of necessity. The question is whether or not we are going to require them to be trained and allow them to take our driving tests in order to ensure that they meet our minimum standards for the operation of motor vehicles. It is astonishing to this court that this debate should even occur or that New York’s Governor should be derided simply because he proposed a solution to the problem of unlicensed drivers on our roadways.. It is equally embarrassing that we as a nation have failed to recognize how our exclusionary policies of the past have always been inher *734 ently against numerous races and ethnic groups.[10] Regrettably those abhorrent, racist, and discriminatory policies of old have not been eradicated and have reemerged to rear their ugly heads once more.
This court has considered the recent speech delivered to the Association of the Bar of the City of New York on November 28, 2007 by Honorable Jack B. Weinstein, former Chief Judge of the United States District Court for the Eastern District of New York. In that speech, Judge Weinstein stressed that the law and the courts exist to serve the people, a concept of which many members of the judicial system lose sight. He noted three key elements of justice: not merely facts and law, but also empathy. There is a growing tendency to close the doors of government and courts to the people, when instead the courts should exist “for the people.” Judge Weinstein recognized a duty to help the disadvantaged where the law reasonably allows such support. He also pointed out an oft-overlooked distinction in the United States Constitution. This court wholeheartedly subscribes to Judge Weinstein’s views on the subject. The Fourteenth Amendment guarantees that no state may “deny to any person within its jurisdiction the equal protection of the laws” (14th Amend § 1; emphasis added). The United States Constitution does not require that a person be a citizen in order to be afforded due process and equal protection of the law.
II. The New York State Licensing System
Vehicle and Traffic Law § 509 (1), setting forth the violation of unlicensed operation of motor vehicles, is defined by Vehicle and Traffic Law § 502, the requirements for licensing. Vehicle and Traffic Law § 502 (1) provides that an “applicant shall furnish such proof of identity, age, and fitness as may be required by the commissioner.” The Department of Motor Vehicles (DMV) has a point system in place for proof of identity. The DMV lists 42 documents, each with a corresponding amount of points; an applicant must provide six points worth of *735 identification in order to be eligible for a driver’s license.[11] The *736 majority of these documents are primary proof of citizenship; many of them are secondary documents, which require proof of citizenship to obtain them. Without the primary proofs of citizenship presented in either a major document (such as a passport) or secondary document (such as a firearms license), it is mathematically impossible to present the proper documentation in order to obtain an operator’s license for a motor vehicle in the State of New York.
The primary reason for this system is to enforce mounting security concerns in our post-9/11 America.[12] In the wake of 9/11, a positive surge of nationalism and justifiable concerns as to our safety arose. Those positive forces unfortunately also produced regrettable side effects: an increased xenophobia and paranoia pervading our culture.[13] One result is that aliens and immigrants are quickly losing rights, and becoming victims to a wave of bigotry reminiscent of a time in our country when racism was codified into our law. The 9/11 Commission, established to prepare a full account of the events surrounding the terrorist attacks of September 11, 2001, made a number of recommendations to *737 improve national security.[14] Among the recommendations implemented was the establishment of a committee between the Department of Homeland Security and Department of Transportation in conjunction with other state and federal officials for the creation of minimum standards for state-issued driver’s licenses and identification cards.[15] This mandate, however, was superceded within six months. Under pressure from President George W. Bush to grant the intelligence community greater powers under a bill for the Global War on Terror,[16] Congress passed the Real ID Act of 2005, which repealed the enactment of the 9/11 Commission’s recommendation for the joint committee to determine minimal standards for licenses.[17] In its place, the federal government mandated minimal requirements which a state must include on its driver’s licenses and ID cards in order to comply with the Department of Homeland Security.[18] The law further stated that no federal agency would accept a driver’s license after May 2008 unless that state had been certified by the Department of Homeland Security, in consultation with the Department of Transportation.[19] These standards are currently in place in New York.
Today, society’s perceptions are often proven to be as invalid as the perceptions against immigrants from centuries ago (a detailed accounting of those perceptions is contained infra at 745-746). There are currently 37.9 million foreign-born persons residing in the United States; approximately 10 million arrived in the last seven years, more than half of them undocumented.[20] Upon review of the immigrant population of New York, some information presents a different portrait than our commonly held misperceptions.[21] There are 261,428 foreign-born persons residing in Nassau County, or 20% the second-highest percentage in the *738 state. Most in this region have been here for longer than 15 years. Fifty-five percent have some college education, and 67% live in owner-occupied homes. The largest employer of immigrants is the nursing field. Only five percent speak no English at all. Our perception of immigrants, however, remains very intolerant.[22] Sixty percent of natural-born citizens surveyed would favor allowing illegal immigrants who have not committed a crime to become citizens, but with the additional unprecedented requirements to the process of paying fines and learning English. Fifty percent of Americans do not favor allowing illegal immigrant parents with legal United States citizen children to stay in the country for the sake of raising their children.
This decision is not being written in order to fan the fires of patriotism. But it does seek to suggest that we have gone overboard in some respects in trying to ensure the security of our nation. Indeed, we have misdirected our fervor. Is there a connection between illegal immigration and terrorism? Perhaps there exists a tenuous link, but that point is extraneous to the issue at hand, as the unlicensed operation of motor vehicles is a separate issue from illegal immigration and terrorism.
III. Legal Analysis
The defendant is charged with two violations which are mala prohibita. Crimes are either mala in se (evil due to intent) or mala prohibita (evil due to legislation, a per se rule).[23] Most serious crimes are mala in se; a defendant’s mens rea or intent constitutes a determinative factor in deciding guilt or could be utilized as a defense. Mala prohibita violations, however, require no intent. In the instant case, were the defendant to hypothetically claim that he attempted to obtain a license in good faith, it could not be construed as a defense or as a mitigating factor. The defendant thus has no ability to raise a defense. As such, this court raises the following considerations sua sponte.
This court has the mandate to hear and decide issues testing the constitutionality of statutes within its purview.[24] The instant case implicates two constitutional clauses, each considered *739 stand-alone pillars within our legal Parthenon. The first pillar is the Equal Protection Clause of the Fourteenth Amendment. As stated supra, the Fourteenth Amendment guarantees that no state may “deny to any person within its jurisdiction the equal protection of the laws.” The second pillar is the Privileges and Immunities Clause. The Privileges and Immunities Clause provides: “The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.”[25] Though traditionally seen as two pillars, these concepts would best be considered as bending to form an arch — the Equal Protection Clause protects the Privileges and Immunities Clause, and the Privileges and Immunities Clause feeds into and defines liberties within the Equal Protection Clause. The privileges and immunities granted to the citizens of the several states under article IV are absolutely vital and necessary for the liberty guaranteed under the Equal Protection Clause of the Fourteenth Amendment. Therefore, the Privileges and Immunities Clause applies to persons, not just citizens. In addition, the statutes at issue in this case also raise a Tenth Amendment issue, in the inherent conflict between congressional regulation of a solidly state function. For the reasons set forth below, this court finds Vehicle and Traffic Law §§ 502 and 509 violative[26] of the Constitution of the United States of America and the New York State Constitution.[27]
A. Equal Protection
1. The Law of Equal Protection Claims
The Fourteenth Amendment to the Constitution of the United States provides:
“All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce *740 any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws” (US Const, 14th Amend, § 1 [emphasis added]).
In considering the Fourteenth Amendment, Representative John Armor Bingham, one of the chief architects of the draft, posed the following questions:
“Is it not essential to the unity of the people that the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States? Is it not essential to the unity of the Government and the unity of the people that all persons, whether citizens or strangers, within this land, shall have equal protection in every State in this Union in the rights of life and liberty and property?”[28]
The first step in considering whether a statute violates the Equal Protection Clause is to discern whether the statute purposefully discriminates against a suspect class. There exist three avenues to determine whether or not a statute purposefully discriminates under the Equal Protection Clause.
“A plaintiff could point to a law or policy that expressly classifies persons on the basis of race. Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.” (Pyke v Cuomo, 258 F3d 107, 109 [2d Cir 2001], quoting Brown v City of Oneonta, N.Y., 221 F3d 329, 337 [2d Cir 2000].)
In addition, a court must find that there exists an intent to discriminate; a mere discriminatory impact is not enough. (Washington v Davis, 426 US 229 [1976].) The discrimination must be against, as one scholar has noted, “perennial losers in the political struggle” due to “widespread, insistent prejudice against them.”[29] Once these factors are determined, a court must apply strict scrutiny, finding the policy necessary to fulfilling a compelling state objective. (Zablocki v Redhail, 434 US 374 [1978].)
*741 The Supreme Court has identified discrimination based on alienage, the condition of not being a citizen, as a “suspect class” worthy of strict scrutiny in several seminal cases. The Court has held, for example, that a state cannot deny welfare benefits to aliens. (Graham v Richardson, 403 US 365 [1971].) Aliens cannot be prevented from admission to a state bar if they otherwise qualify to practice law. (In re Griffiths, 413 US 717 [1973].) A state may not bar aliens from civil service. (Sugarman v Dougall, 413 US 634 [1973].) The Court struck down a New York statute which barred certain resident aliens from obtaining educational scholarships and financial aid. (Nyquist v Mauclet, 432 US 1 [1977].) The aliens within these cases were all in the country legally. However, there clearly does exist protection by the Supreme Court for aliens within our borders who are here illegally.
The concept that the Equal Protection Clause applies to illegal aliens is well settled in our judicial system. The Supreme Court has held that for due process and equal protection purposes, illegal aliens are “persons.” In Plyler v Doe (457 US 202, 215 [1982]), the Court held:
“Use of the phrase ‘within its jurisdiction’ thus does not detract from, but rather confirms, the understanding that the protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who is subject to the laws of a State, and reaches into every corner of a State’s territory. That a person’s initial entry into a State, or into the United States, was unlawful, and that he may for that reason be expelled, cannot negate the simple fact of his presence within the State’s territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State’s civil and criminal laws. And until he leaves the jurisdiction — either voluntarily, or involuntarily in accordance with the Constitution and laws of the United States — he is entitled to the equal protection of the laws that a State may choose to establish.”
Plyler struck down a Texas statute which denied access to public schools for those children who were not legally admitted to the United States. The Court held that the statute was not a rational means of furthering any state interest.
2. Analysis
The language of Vehicle and Traffic Law § 502 (1) is neutral. There exists no explicit discrimination of any suspect class on *742 its face. However, the facially-neutral statute is discriminatory in its application. Section 502 (1) vests the Commissioner of the Department of Motor Vehicles with the discretion to set requirements for proof of identity. This requirement in and of itself would not be enough to declare the statute unconstitutional. However, the Commissioner of the Department of Motor Vehicles is required by the Real ID Act of 2005 and New York State policies to comply with that act to implement these new requirements excluding noncitizens from obtaining licenses. As the Commissioner is locked into the manner in which he must fulfill his duties, any discretion contained within the statute disappears, and is replaced by the congressional mandate. The Commissioner has in fact set requirements in such a way that Vehicle and Traffic Law § 502 (1) discriminates against undocumented aliens. It is impossible for an undocumented immigrant to prove their identity under the current scheme established by the Commissioner.
The court finds that the defendant is a member of a suspect class. He is an alien, and a noncitizen. As such, he triggers the appropriate consideration under equal protection analysis. Undocumented immigrants are without a doubt “perennial losers in the political struggle” due to “widespread, insistent prejudice against them.”[30]
For as much as America was built upon immigration, America has a history of discrimination against minority immigrant populations.[31] When the first European explorers like Columbus and Cortez came to this continent, they raped, pillaged, and enslaved the native indigenous populations. When the Dutch and English settlers came over, they swindled[32] and displaced the native Indian population. Our colonial economy was built on the backs of slaves, from Africa and the Caribbean. They were abducted from their homelands, treated, sold, and bred like animals. The Supreme Court even ruled that those of *743 African descent could never be citizens of the United States.[33] The United States Government waged active campaigns for over 250 years to exterminate and subjugate the Indian population in America. After fighting the Civil War not over human rights, but over the issue of nullification,[34] slavery was ended as a by-product. However, in the antebellum South, discrimination against the newly-emancipated black population was codified in what was known as the Jim Crow laws.[35] In addition, the United States military, hardened by the Civil War, continued their campaign against the Indians. After the last of the war chiefs such as Crazy Horse and Sitting Bull were killed, the United States Government convinced the remaining broken Indian population to sign the Dawes Act, allowing the President to survey and allot native tribal lands as he saw fit. The Dawes Act was superceded within a decade in favor of the current reservation system in place today.
Approximately at the same time, a new wave of immigrants from Europe began to arrive. The Irish began arriving after their famines, beginning in 1848. They sought relief here from the British government, which, despite refusing to recognize Irish sovereignty, refused to provide any relief. The Irish were met with signs in windows that read: “Help Wanted: No Irish Need Apply.” The Italians, Germans, and Jewish people from all countries arrived as well and met with similar discrimination. These immigrants arrived at Ellis Island and were met with quotas — only a certain amount of immigrants from each country were allowed into the United States. During the Civil War, those that were permitted to enter were exploited. Official-looking men offered male immigrants literally coming off the boat a token sum of money if they signed a piece of paper. What the immigrants did not realize was that this money was a signing *744 bonus — they had just been enlisted to fight for the Union. They were literally marched off one boat and onto another boat bound for the Virginia battlefields. Tammany Hall political mechanics gave the people bread right off the boat to ensure they would be cogs in their machine. The Italians, Germans, Jews, Irish, and others banded together into their communities, and built their own societies in the great melting pot that became America, until such time as they rose to the top of the political structure and ended these policies.
Women had to fight for their suffrage, and finally obtained it.[36] Workers fought for their rights by unionizing. In a significant step backwards, the United States Government rounded up all persons of Japanese descent in America and detained them for years in internment camps following the attack on Pearl Harbor during World War II.[37] The black population fought for their rights and for a society which would be blind towards race and ethnicity after being granted citizenship and, over the course of several decades and the work of dedicated people, civil rights were codified into the same law that had once been used to discriminate against them.[38]
Immigrants today, however, have no one to fight for them. Indeed, they are precluded from the fight. With our current attitudes, we complain about them working the highly-skilled jobs for which they have been qualified through education and experience, and we sit by silently and allow them to do the jobs that we are unwilling to perform. In the midst of this hypocrisy, we do not even allow them a foothold to secure their rights, in spite of a marked tradition of doing so in the past. This fact constitutes perhaps the most damning aspect against any argument that aliens are not a suspect class — at their essence, aliens cannot vote. They naturally must wait for their citizenship in order to participate in the political struggle in this country. This particular fact is most important — they cannot better their situation and must rely on citizens to take up their causes. They are silenced and shut out of our legal debate.
The final nail in the coffin for a statute that draws scrutiny under the Equal Protection Clause is an intent to discriminate. The policies handed down from the Department of Homeland *745 Security in the wake of 9/11 exist primarily to protect our country from another terrorist attack of that terrible magnitude. Our primary suspects are non-United States nationals; we rarely suspect our own citizens.[39]
In order for Vehicle and Traffic Law § 502 (1) to survive strict scrutiny under the Equal Protection Clause, it must be demonstrated that it was drafted in a way which fulfils a compelling state objective. This court must identify the compelling state interest in denying undocumented aliens driver’s licenses. Invariably, two arguments arise: national security and the economy. This court’s analysis reveals that both arguments fail to survive strict scrutiny.
The Supreme Court has held that national security may be considered a compelling state interest for equal protection purposes. (Korematsu v United States, 323 US 214 [1944].) Identifying a compelling interest requires an analysis into whether the means employed constitutes a necessary end to the state’s objective. The issues of immigration and national security have become convoluted in our society. The public mistakenly identifies one issue from two separate problems: border control and illegal immigration.
Some reasons often cited in the debate over immigration are economic concerns: citizens are worried that noncitizens will take their jobs. However, as noted supra, 55% of immigrants have a college education or higher, compared to the national average (in which immigrants are included) of 29.5%.[40] Statistically, immigrants in this country tend to hold a higher level of education. These immigrants with levels of high education are presumed to be here legally due to rigid educational enrollment *746 requirements; but, as such, they are immune to this debate. Considering illegal immigrants, the public is concerned that they will take jobs normally held by American citizens. The counterargument offers that immigrants perform jobs that “average” Americans would not perform. Regardless, the Supreme Court has been silent on the issue of whether the economic concerns of a state government, much less the concerns of public opinion, qualify as a compelling state interest. This court does not find the economic arguments persuasive, and will not consider those baseless contentions.
Maintaining our borders serves two functions: national security and immigration control. Naturally, we are justified in patrolling our borders for security threats, be it from the armed forces of another country, by a rogue terrorist, or in the effort to exclude contraband materials. These aspects of border patrol fall within the gamut of national security. The issue at hand, though, is immigration and the presence of undocumented, and, therefore, “illegal,” aliens in our country. Our country was founded on immigration to such an extreme extent that Europeans displaced the native populations on this continent upon their arrival. The symbol of our country, the Statue of Liberty, seen by millions immigrating to this country over the last century, has inscribed on its base, “Give me your tired, your poor, your huddled masses yearning to breathe free.”[41] Our national policy is to welcome immigrants. They are here “illegally” by virtue of not having the prior permission of a government comprised of the descendants of immigrants and immigrants themselves. In addition, immigrants must be legal permanent residents for five years less 90 days to become naturalized. Immigration has nothing to do with national security, and has only ridden on the coattails of our collective fear in the wake of a national tragedy. Curtailing the action of immigrants by not permitting them to drive has no rational connection to national security. If anything, granting licenses to drive increases our domestic safety by insuring that immigrants are certified to drive. Denying immigrants, regardless of their legal status, a driver’s license in no way constitutes a necessary means for achieving national security.
This court defers to the Supreme Court in holding that national security is a compelling national interest. However, it does not find that precluding illegal immigrants from obtaining *747 driver’s licenses constitutes a necessary means to achieving that objective. As such, Vehicle and Traffic Law § 502 (1) and § 509 (1) are violative of the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and article I of the New York State Constitution.
B. Privileges and Immunities
1. The Law of Privileges and Immunities Claims
The Privileges and Immunities Clause guarantees that “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” (US Const, art IV § 2 [1].) Though the clause states “citizens,” it is long settled in practical application that a state cannot discriminate against “non-residents.” (Toomer v Witsell, 334 US 385 [1948].) A court must also determine whether a fundamental right traditionally associated with the Privileges and Immunities Clause has been violated. The right of a nonresident to pursue a livelihood in a state other than his own has been declared “fundamental.” (Baldwin v Fish & Game Comm’n of Mont., 436 US 371 [1978].)
Under an analysis of the Privileges and Immunities Clause, this court must consider
“(1) whether a State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens, and (2) if so, whether there is sufficient justification for the discrimination. A ‘sufficient justification’ can be shown by a State demonstrating (a) a substantial reason for the discrimination, and (b) a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted by enactment of the discriminatory statute. The availability of less restrictive means is considered when evaluating the measure and degree of the relationship between the discrimination and state interest.” (Connecticut ex rel. Blumenthal v Crotty, 346 F3d 84, 94 [2d Cir 2003] [citations omitted].)
New York State has a similar “privileges” clause. Article I (§ 1) of the New York Constitution guarantees that “[n]o member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers.” Like the Equal Protection Clause of the United States Constitution, the New York State Constitution affords “members” of the state the same privileges guaranteed to citizens of the state.
*748 2. Analysis
The defendant, by his status as an illegal immigrant, is considered a nonresident of the State of New York, despite a claim of residency as demonstrated by the simplified traffic instrument. The right to pursue a livelihood is a privilege guaranteed under the Privileges and Immunities Clause. As a noncitizen, the defendant would not normally qualify for the guarantees under this clause. However, as held supra, the defendant, by virtue of his status as a “person” is afforded the equal protection of the law and liberty under the Fourteenth Amendment. This court holds that the privilege to pursue a livelihood is without a doubt essential to liberty. As such, the defendant’s case warrants analysis under the Privileges and Immunities Clause.
The State of New York has, in fact, discriminated against nonresidents with regard to the privileges and immunities it accords its own citizens. The State has promulgated a system which makes it impossible for illegal aliens to obtain a driver’s license in this state. Aliens residing here legally as well as citizens may obtain licenses by providing the necessary documents. Undocumented immigrants cannot provide these documents, and thus cannot obtain a license. Discrimination has, in fact, occurred and continues to occur.
The next step is to find a sufficient justification for the discrimination. In determining a sufficient justification, there must be a substantial reason for the discrimination and a reasonable relationship between the degree of discrimination exacted and the danger sought to be averted by enacting the discriminatory statute. The justifications and concerns for denying immigrants have already been discussed supra. As neither justification was satisfactory under the higher “compelling” standard, any justification falls that much farther short of the “substantial” standard. Thus, there exists no substantial reason for denying undocumented immigrants the ability to obtain a driver’s license. As such, any analysis of whether there exists a reasonable relationship is moot. This court finds Vehicle and Traffic Law § 502 (1) and § 509 (1) violative of the Privileges and Immunities Clause of the United States Constitution and article I of the New York Constitution.
Separate from federal considerations, Vehicle and Traffic Law § 502 (1) and § 509 (1) violate article I (§ 1) of the New York Constitution per se. The defendant is certainly a member of the *749 State — simply by virtue of being physically present, even illegally. He is therefore also subject to this court’s jurisdiction. As such, he shall not be “deprived of any of the rights or privileges secured to any citizen thereof.” The driver’s licensing scheme in this state precludes undocumented immigrants from obtaining a driver’s license, a privilege afforded to citizens of the state. Therefore, Vehicle and Traffic Law § 502 (1) and § 509 (1) are unconstitutional under this analysis as well.
C. Tenth Amendment
1. The Law of the Tenth Amendment Claims
The Tenth Amendment to the Constitution of the United States reads: “The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” Claims under the Tenth Amendment generally arise when there is a conflict between federal and state law regarding a certain policy. Congress cannot simply “commandeer[ ] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.” (Hodel v Virginia Surface Mining & Reclamation Assn., Inc., 452 US 264, 288 [1981] [statute regulating mining was upheld because it did not commandeer the state legislative process].) In summarizing the modern position on thé Tenth Amendment, the Supreme Court explained,
“In providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.” (New York v United States, 505 US 144, 166 [1992].)
In New York, the Court held that a federal regulation which required the state to either take ownership of nuclear waste not in conformity with federal regulations or regulate the waste according to the guidelines of Congress violated the acceptable line of its powers. The Court held that both actions, ordering the state to take title and directly regulate, would be beyond the scope of Congress’ power; together, the clause was doubly unacceptable. (Ibid, at 176.)
*750 2. Analysis
The two parties implicated in the instant action are the State of New York and the United States, via Congress. The granting of licenses traditionally and firmly falls within the exclusive power of the states. Congress has passed a law, the Real ID Act of 2005, which essentially directs states to meet with certain guidelines set by the Department of Homeland Security in consultation with the Department of Transportation. If New York does not comply, New York’s citizens will not be able to use their driver’s licenses as identification for any federal agency. It places into question what will happen when a driver crosses state lines and presents a noncompliant license in a state which mandates compliance. It also means they will be precluded from using a driver’s license for identification for any federally regulated services, ranging from governmental functions such as applying for a passport to even reaching into the private sector, providing identification for banking purposes.
The choice presented here is clear: New York may comply with Congress’ direct regulation, or its citizens may suffer the consequences. Much like in New York v United States (supra), Congress has exceeded the scope of its powers by attempting to directly regulate a function which belongs to the State of New York. As such Congress has violated the Tenth Amendment and so has the Commissioner of Motor Vehicles by acquiescing to Congress’ illegal mandate.
Unfortunately, this court has no jurisdiction over Congress, nor does it have the power to legally bind it for the violation of this Tenth Amendment claim. The State of New York would have to raise this claim on its own behalf before a federal court. However, it should be noted that the State of New York is equally at fault in this violation by its compliance with this act. By not challenging this statute, the State of New York is complied; with Congress’ violation.
IV Conclusion
Our immigration policies and legitimate concerns for the security of our nation need not be reconciled in the context of immigrants receiving driver’s licenses. This court finds that Vehicle and Traffic Law §§ 502 and 509 (1) are unconstitutional and accordingly dismisses the section 509 (1) charge for the reasons heretofore enumerated. The section 319 (1) charge remains intact because the registered owner, albeit not this defendant, of a vehicle should be able to secure insurance, because all vehicles *751 being operated in New York must be insured. This court informs the defense at this time that if the defendant pleads guilty to or is found guilty of the section 319 (1) charge, the court will impose the maximum fine of $1,500 together with a 15-day jail sentence.

. Vehicle and Traffic Law § 509 (11): “A violation of any provision of this section shall be punishable by a fine of not less than seventy-five nor more than three hundred dollars, or by imprisonment for not more than fifteen days, or by both such fine and imprisonment.”
Vehicle and Traffic Law § 319 (1):
“Any owner of a motor vehicle registered in this state, or an unregistered motor vehicle, who shall operate such motor vehicle or permit it to be operated in this state without having in full force and effect the financial security required . . . upon conviction may be fined not less than one hundred fifty dollars or more than one thousand five hundred dollars or may be imprisoned for not more than fifteen days or both.”

. People v Shumake, NYLJ, Oct. 28, 1999, at 32, col 2 (Just Ct, Vil of Westbury).

. The defendant was convicted of unlicensed operation on three separate occasions prior to the instant case: in Old Westbury in 2006, in Nassau County in 2005, and in Suffolk County in 2005.

. “In September, . . . Spitzer announced plans to grant driver’s licenses to undocumented immigrants. It made sense, promising to increase highway *733 safety, reduce insurance premiums, and help keep tabs on a hidden population.” (See David Margolick, The Year of Governing Dangerously, Vanity Fair, Jan. 2008, at 59.)

. See Monica Davey, Immigration, and Its Politics, Shake Rural Iowa, New York Times, Dec. 13, 2007, section A, col 3, at 1.

. James Madore, Spitzer’s License Plan U-turn Won’t Be Easy, Newsday, Nov. 15, 2007, section A, at 14.

. “[T]he safety of the people shall be their highest law.” (Cicero, De Legibus 3.3.8.)

. See Ryan Lizza, Return of the Nativist: Behind the Republicans’ Anti-Immigration Frenzy, New Yorker, Dec. 17, 2007, at 46.

. See Honorable Thomas F. Liotti, Unlicenced Driving Not An Immigration Issue, 15 Att’y Nassau County [No. 8] 1 (Sept. 2007) (an article for which the Justice received personal praise from Governor Spitzer via letter, dated Oct. 23, 2007).

. Alexis de Tocqueville noted in Democracy in America (1835) that “[t]he expulsion of the Indians often takes place at the present day in a regular and, as it were, a legal manner.” Senator Henry Cabot Lodge also advocated racially-motivated strategies for handling the populations within territory acquired during the Spanish-American War. These are in addition to a multitude of Jim Crow laws and segregation throughout our nation until Brown v Board of Education. (See Mark Weiner, Americans Without Law: The Racial Boundaries of Citizenship [New York Univ Press, New York 2006].)

. According to the DMV as of December 2007, the following documents are acceptable for proof of identity (their corresponding point values follow afterwards): (1) A driver license, a learner permit, or a nondriver photo ID card issued by New York State. The photo document must be valid or expired for less than two years. 6 points; (2) DMV form MV-45 (Statement of Identity), if the applicant is under the age of 21. The form must he signed by a parent or a legal guardian, in front of a DMV representative. Proof of date of birth of applicant and Social Security card are also required. See form MV-45 for instructions. 4 points; (3) DMV form MV-45A (Statement Of Identity — For Applicants Represented by Government or Government-Approved Facilities) — an identity affidavit completed by a state, federal or local government agent representative for a mentally and/or physically challenged applicant. Proof of date of birth of applicant and Social Security card are also required. See form MV-45A for instructions. 4 points; (4) A US passport. 4 points; (5) A Certificate of Citizenship (N-560, N-561, or N-645). 3 points; (6) A Certificate of Naturalization (N-550, N-570 or N-578). 3 points; (7) A foreign passport with a valid 1-551 stamp or a statement on the visa. The passport must be in English or translated by an embassy. 3 points; (8) A Permanent Resident Card (form 1-551). 3 points; (9) A foreign passport with your visa and form 1-94. The passport must be in English or translated by an embassy. 3 points; (10) A foreign passport with your visa and form 1-94 with status code J1 or J2 and with form IAP-66/DS-2019. If you received an extension, you must show your original entry document, form IAP-66/DS-2019, any extension document and, if appropriate, a “notice of approval.” 3 points; (11) A foreign passport with your visa and form 1-94 with status code FI or F2 and form 1-20. To be accepted, the school must be located in New York State. If you received an extension, you must show your original entry document, form 1-20, any extension document and, if appropriate, a “notice of approval.” 3 points; (12) A foreign passport with your visa and form 1-94 with status code G4. You must apply at the DMV Herald Square office only. 3 points; (13) A foreign passport with your visa and form 1-94 with status code I and a letter from the Foreign Press Center. You must apply at the DMV Herald Square office only. 3 points; (14) A US Re-entry Permit (1-327). 3 points; (15) A US Refugee Travel Document (1-571). 3 points; (16) A US Employment Authorization Card (INS I-688B or 1-766). 3 points; (17) A US Military Photo ID Card (issued to military personnel only). 3 points; (18) A welfare card, a Medicaid card, or a New York State Food Stamp Card with a photo. 3 points; (19) A pistol permit issued by New York State or New York City. 2 points; (20) A professional license issued by New York State. 2 points; (21) A photo driver license issued by another state, jurisdiction or possession of the United States, or issued by a province or territory of Canada. The driver license must be valid or expired less than one year. 2 points; (22) A United States Social Security card that shows your signature. 2 points; (23) A New York State registration document for a vehicle or a boat only. 2 points; (24) A New York State title certificate. 2 points; (25) A Military Dependent ID Card. 2 points; (26) A welfare card, a Medicaid card, or a New York State Food Stamp Card without a photo. 2 points; (27) A United States marriage document, a United States divorce document, or a court-issued name change document. 2 points; (28) A United States college photo ID card and an academic transcript. 2 points; (29) A New York State interim driver license or a computer-generated learner permit, without a photo. 2 points; (30) A United States high school ID card and a report card. 2 points; *736 (31) A valid Saint Regis Mohawk Tribe ID card. 2 points; (32) A valid Saint Regis Mohawk Tribe ID card and a Canadian birth certificate. 2 points; (33) A computer-printed pay stub or employee ID card issued in the United States that shows your name. 1 point; (34) A high school diploma or GED (General Education Diploma) issued in the United States. 1 point; (35) A supermarket check-cashing card issued in the United States with your name preprinted and your signature. 1 point; (36) A union card issued in the United States. 1 point; (37) A health insurance card or a medical prescription card issued in the United States. 1 point; (38) A life insurance policy issued in the United States and in effect for at least two years. 1 point; (39) A utility bill issued in the United States. 1 point; (40) A Veterans Universal Access Photo ID Card. 1 point; (41) A W-2 Form that shows your Social Security number. 1 point; (42) You can provide only one of these items issued by a financial institution issued in the United States: a bank statement, a cancelled check (which displays your preprinted name), an ATM card or a debit card (which displays your preprinted name and your signature), a valid major US credit card. 1 point.

. See Matthew Wald, U.S. to Specify Documents Needed for Driver’s Licenses, New York Times, Dec. 9, 2004, section A, col 1, at 36 (detailing how Congress authorized the Department of Homeland Security to set standards for issuances of driver’s licenses, once a function entirely within the control of the states).

. The distinguished Mayor of this village and current president of the New York Conference of Mayors, Honorable Ernest Strada, lost his son Thomas on 9/11. This decision is written with the utmost respect and reverence for the Mayor, his family, his late son, and all other victims of the 9/11 terrorist attacks.

. The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States (W.W. Norton Press, New York 2004).

. Intelligence Reform and Terrorism Prevention Act of 2004 § 7212 (Pub L 108-458, 118 US Stat 3827).

. Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 (Pub L 109-13, 119 US Stat 231).

. Real ID Act of 2005 § 206 (Pub L 109-13, division B, tit II, 119 US Stat 302, 316).

. Ibid. § 202 (c).

. Ibid. § 202 (a).

. Julia Preston, 7-Year Immigration Rate Is Highest in U.S. History, New York Times, Nov, 29, 2007, section A, col 5, at 20.

. Fiscal Policy Institute, Working for a Better Life: A Profile of Immigrants in the New York State Economy (Nov. 2007).

. Janet Hook, 1 in 3: No Social Services for Illegal Immigrants, News-day, Dec. 6, 2007, section A, col 1, at 23 (reporting the results of a Los Angeles Times — Bloomberg poll surveying 1,245 voters).

. LaFave and Scott, Criminal Law § 6 (West Publ, St. Paul 1972).

. See generally Santangelo v State of New York, 193 AD2d 25 (2d Dept 1993) (where the Court of Claims sua sponte declared General Municipal Law § 205-e unconstitutional [reversed on appeal]); Matter of Corr v Clavin, 96 Misc 2d 185 (Sup Ct, Nassau County 1978) (where a Nassau County District Court Judge declared CPL 180.40 unconstitutional [reversed on appeal]).

. US Const, art IV, § 2 (1).

. Pursuant to CPLR 1012 (b) (1), the New York State Attorney General was notified on December 17, 2007 and responded via facsimile letter shortly thereafter on the same day, stating that they were forwarding the notice to the proper office.

. New York Constitution, article I, § 11, substantially similar to the Equal Protection Clause of the Fourteenth Amendment, reads:
“No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state” (emphasis added).

. Cong Globe, 39th Cong, 1st Sess, at 1090 (Feb. 28, 1866) (emphasis added).

. Laurence Tribe, American Constitutional Law, at 1454 (2d ed, Foundation Press 1988).

. Tribe, American Constitutional Law, at 1454.

. For a detailed account of American history from the minority and immigrant perspective, see Howard Zinn, A People’s History of the United States: 1492-Present (New York 2003).

. There are notable accounts in American history about settlers swindling land from the Indians, who had no concept of personal property. Dutch settlers bound Indians to convey the island of Manhattan to them for what amounted to $24 worth of beads and trinkets. William Penn entered into an agreement with local Indians allowing him to colonize land equal to the distance a man could walk in one day. Penn honored this agreement by setting up a relay of marathon runners across what is today Pennsylvania.

. Dred Scott v Sandford, 19 How (60 US) 393 (1857).

. Contrary to popular perception, the Civil War was not fought over slavery, but over the issue of nullification. In our federalist system, both the national and state governments have dual sovereignty. One of the issues the southern states insisted upon was the individual state’s ability to nullify a federal law. In the instance of the Civil War, the federal government, seated in the North (whose inclusive state economies had moved beyond the need for slavery), outlawed slavery, which affected the South (whose state economies were still very much dependent on slavery). As such, the southern states attempted to nullify the federal government’s decrees. The federal government refused to recognize the power of the states to nullify a law, and as a result the southern states seceded from the Union.

. C. Vann Woodward, The Strange Career of Jim Crow (Oxford Univ Press, New York 1957).

. US Const Amend XIX.

. See Korematsu v United States, 323 US 214 (1944).

. See Brown v Board of Education, 347 US 483 (1954); Civil Rights Act of 1964 (Pub L 88-352, 78 US Stat 241); see also 42 USC § 1982 et seq. (establishing civil remedies for civil rights violations).

. The court notes two American citizens who garnered attention for defecting from this country to join the two forces our country took action against following the terrorist attacks: John Walker Lindh (the American citizen captured while fighting for the Taliban in the 2001 invasion of Afghanistan), and Ryan G. Anderson (a National Guard specialist in Washington state convicted of spying for A1 Qaeda). Both men were convicted and sentenced to lengthy prison sentences.

. (United States Census, 2000.) It should be noted that immigrants, legal or otherwise, are to be counted in the Census. In 2000, the Immigration and Nationalization Service worked with the Census Bureau to not conduct any raids on households with illegal immigrants. However, the Bush administration recently stated their objection to such an agreement in the future, prompting the Immigration and Naturalization Service to announce what would amount to a large-scale pogrom directed towards immigrants in 2010. (See Stephen Ohlemacher, US: Census Won’t Deter Immigration Raids, Washington Post, Aug. 17, 2007.)

. From the poem The New Colossus, by Emma Lazarus.